**Mildred GALFAND, on behalf of herself and on behalf of American Investors Fund, Inc., Plaintiff,**

v.

**George A. CHESTNUTT, Jr., and Chestnutt Corporation, Defendants, and American Investors Fund, Inc., Nominal Defendant.**

**No. 73 Civ. 3849.**

United States District Court, S. D. New York.

July 23, 1975.

Supplemental Findings and Conclusions Nov. 10, 1975.

---

1. Of course, the respective parties do not agree as to where the cases should be consolidated.

Kreindler & Kreindler, New York City, for plaintiff.

Rogers Hoge & Hills, New York City, for defendants.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This shareholder's derivative action was commenced on July 6, 1973 in the United States District Court for the Eastern District of Pennsylvania, seeking a preliminary injunction to restrain American Investors Fund from conducting its annual shareholders meeting set for July 17, 1973.

Plaintiff owns 86 whole shares of American Investors Fund, a New York corporation ("AIF" or the "Fund"), an open-end no-load mutual fund registered under the Investment Company Act of 1940 (15 U.S.C. § 80a–1, *et seq.*, the "Act").

In addition to the Fund itself, defendants are Chestnutt Corporation, a Connecticut corporation, which is AIF's investment adviser, and George A. Chestnutt, Jr., President and Director of the Fund and President, Director and owner of 47% of the shares of the adviser.

This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a–35(b).

On July 11, 1973, the Honorable Raymond J. Broderick, United States District Judge, Eastern District of Pennsylvania, held a hearing on plaintiff's motion for an injunction. On the same day, defendants moved to transfer the action to this Court, pursuant to 28 U.S.C. § 1404(b). On July 13, 1973, Judge Broderick denied plaintiff's motion for a preliminary injunction. [Decision reported at 363 F.Supp. 291 (E.D.Pa. 1973)]. The evidence presented in support of plaintiff's motion was limited (see 363 F.Supp. p. 293); on the basis of the sparse record before him Judge Broderick held (363 F.Supp. p. 296):

> "The Court, therefore, concludes that the plaintiff has not established the first prerequisite for the issuance of a preliminary injunction—a reasonable probability of eventual success on the merits."

Subsequently, Judge Broderick granted defendants' motion for change of venue to this Court. [Decision reported at 363 F.Supp. 296.]

On June 21, 1973, proxy solicitation materials for the annual shareholders' meeting on July 17, 1973 were mailed by management to AIF's shareholders. Proxies were solicited and shareholder approval sought, *inter alia,* for a new contract between the Fund and its investment adviser, Chestnutt Corporation. The new contract was intended to replace a prior contract dated as of September 1, 1972 (Ex. 4, hereinafter referred to as the "old agreement"), which had not yet expired. The Fund and its adviser had an established custom and practice of executing two year agreements which were replaced annually, a year prior to the expiration date.

The adviser's fees were unchanged by the new agreement. The only change proposed was an increase in the "expense ratio limitation" from 1% to 1½%. Under paragraph 9 of the old agreement, the adviser was required to reimburse the Fund, up to the amount of its fee for the year, to the extent certain expenses, together with the fee, exceeded 1% of the Fund's average monthly net assets (see paragraph 9, quoted in full, *infra,* p. 1331).

Plaintiff claims Mr. Chestnutt influenced the other Fund directors improperly to have the expense ratio increased to 1½%, and did so solely for the benefit of the adviser and contrary to the interests of the Fund, to forestall an anticipated rebate of the fee during the year 1973, all in violation of 15 U.S.C. § 80a–35(b).[1]

Plaintiff also claims defendants made false and misleading statements in the proxy materials to obtain shareholder approval of the change, in violation of 15 U.S.C. § 80a–20(a)[2] and Rule 14a–9[3] [17 C.F.R. § 240.14a–9].

1. That statute reads in pertinent part as follows:

 "(b) For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by . . . a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments . . . ."

2. 15 U.S.C. § 80a–20(a) reads as follows:

 "It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

3. Rule 14a–9 reads as follows:

 "(a) No solicitation subject to this regulation shall be made by means of any proxy

The proxy materials (Ex. 1) state that the expense ratio limitation increase was sought because of rising costs, which neither the Fund nor its adviser could control. Plaintiff claims this is false. The proxy materials also state that no rebate would have been due the Fund had the 1½% expense ration limitation been in effect in 1972. Plaintiff claims this statement is incomplete and misleading. With the market value of net assets declining and an expense ratio limitation of 1% of the Fund's net asset value, the Fund most likely would have been entitled to a refund of a portion of the adviser's fees for 1973. Plaintiff contends the shareholders should have been told a change to a 1½% limitation would result in a loss of that foreseeable refund.

The AIF annual meeting was held as scheduled on July 17, 1973 and the proposed new contract (Ex. 1) was approved by the Fund's shareholders.

On July 25, 1974, this Court granted defendants' motion to dismiss, as moot, the original complaint seeking equitable relief. Leave to file an amended complaint was granted plaintiff upon posting a $1,000.00 bond, pursuant to Local Rule 2 of the Civil Rules of this Court. Bond was posted, and an amended complaint was filed on August 14, 1974. The amended complaint makes the same allegations and seeks judgment voiding the new advisory agreement, requiring defendants to account for and pay over to AIF any rebate which would have been due had the expense ratio limitation of 1% remained in effect for 1973.

Trial of this action commenced on February 18, 1975 before the Court without a jury.

*Factual Background of the Dispute.*

AIF was formed by George Chestnutt in 1957. Since its inception, Chestnutt Corporation or its predecessors (all controlled by Mr. Chestnutt) served as adviser to the Fund, providing research and guidance in the administration of the Fund's assets, office space, and related office expenses, executive salaries and promotional costs.[4]

Mr. Chestnutt was one of the first investment advisers to develop a theory of investment strategy based on keeping complex statistical records or charts showing historical price and volume fluctuations, and relative performance of individual stocks and stocks of selected industry groups. Since 1946, Mr. Chestnutt has edited and published a weekly technical stock market letter, "American Investors Service."

Mr. Chestnutt and many respected investors believe that market trends can be predicted by analysis of statistics and charts showing trends with respect to price fluctuations of individual stocks, stocks in industry groups, and the stock market in general. Chestnutt Corporation furnishes the Fund with "continuing analysis of the action of over 1,000 issues by means of daily charts supple-

---

statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

4. The Investment Advisory Agreement lists the items of expense as follows (Ex. 2, p. 17):
"7. The Investment Adviser shall furnish to [the Fund] such office space as may be necessary for the suitable conduct of the [Fund's] business and all necessary light, heat, telephone service, office equipment and stationery and stenographic, clerical, mailing and messenger service in connection with such office; and pay the salaries of all of the Fund's executives, and pay all promotional, travel, and entertaining expenses relating to Fund sales."
According to AIF's prospectus (Ex. 1, p. 3):
"The Fund . . . pays brokerage, transfer agent fees, costs relating to reports to shareholders, auditing and legal fees, custodian fees, registration and filing fees, and taxes, and membership fees of the Investment Company Institute."

mented by a weekly computer analysis of relative market performance," and correlations of "economic findings with technical studies in the fields of money, credit availability and banking statistics." (Ex. 1, p. 4).

The Fund was organized on the theory that, unlike other funds, it would provide an opportunity to participate in a portfolio administered in accordance with the general theories expounded by the Chartists, and Mr. Chestnutt's theories in particular. This method or practice required extensive administrative overhead. At one time, Chestnutt Corporation employed 110 people to administer this Fund and its other accounts. By the end of 1974, the staff had been cut to approximately 37. (Tr. p. 69).

The preparation of charts and computer analyses makes the service provided by Chestnutt Corporation expensive, but the Fund's shares were sold and bought upon the representation that this unique investment strategy would be pursued by the Fund's manager. Although Chestnutt's methods may not have been particularly successful in recent years, they remain respectable, and enjoy acceptance among knowledgeable investors.

As an open-end no-load investment company, the Fund may have a board of directors "all the members of which, except one, are interested persons of the investment adviser" [15 U.S.C. § 80a–10(d)]. At the time of the events in suit, AIF's board consisted of eight members, three of whom were not "interested persons". The other five, including Mr. Chestnutt, were all affiliated in some fashion with Chestnutt Corporation.

Each contract between the Fund and the adviser was for a term of two years, but was submitted to the shareholders for approval annually as is required by the Act, and its terms were in compliance with the Act (15 U.S.C. § 80a–15).

The annual fee received by Chestnutt Corporation was computed as a percentage of the net assets of the Fund.

The 1% expense ratio limitation was added to the contract renewed some years prior to the events in suit at the instance of state regulatory commissions, notably in California, where the Fund sold shares.

The investment performance of the Fund over the years had been relatively unsuccessful compared with other funds.[5] Fund assets had declined in market value from $220,000,000.00 in September 1972 to less than $150,-000,000.00 in May 1973. Expenses had been increasing due primarily to inflation. In 1970 the Fund instituted a minimum investment requirement of $400.00. Prior thereto, it had required no minimum investment. As a consequence, it had a large proportion of small accounts, and thus its administrative expenses of the sort which are directly related to the number of accounts (shareholders) were high, compared with funds which had few small shareholders.

*Violation of Fiduciary Duty.*

In 1972 and early 1973, AIF, like other funds, was suffering from a decline in the total market value of its assets, caused by shareholder redemptions and a general drop in market prices of securities. In May 1973, it appeared likely that unfavorable market conditions would continue, and the adviser's total fee would therefore decline with the asset value of the Fund. It also appeared likely that expenses of the Fund would increase with the foreseeable result that Chestnutt Corporation would then be required to refund some part of its fee to the Fund in compliance with the 1% expense ratio limitation contained in the advisory contract dated September 1, 1972 then in effect. Mr. Chestnutt thought this eventuality likely within a

---

5. See Ex. 7, showing that for the five-year period January 1, 1967 to December 31, 1971, the Fund was last in "performance" of a group of 206 funds studied by "Fundscope," a respected financial publication.

year or two (Deposition of George Chestnutt, June 4, 1974, p. 14).

The Board of Directors of AIF had frequently considered its rising expenses but had never considered increasing the expense ratio limitation until the matter was brought up by Mr. Chestnutt at a board meeting on May 21, 1973. Messrs. Cram and Lee, attorneys for the Fund and for Chestnutt Corporation were asked to make inquiries of those securities commissioners of the states requiring an expense ratio limitation, and to report to the board at its next meeting.

At the next meeting of the board on June 5, 1973, the proposed increase was approved, to be implemented in a new contract to be submitted at the July meeting, and dated as of September 1, 1973. Eugene Ulrich, a disinterested director of the Fund distributed to the directors on June 5th a table (Ex. 14) listing twenty funds having assets over $100,000,000.00, their number of shareholders, turnover rate, percent of expenses, and management fees. This tabulation submitted by Ulrich was the only information the directors had before them when they were discussing the advisability of increasing the expense ratio. No further information was requested by the directors and none was offered by Chestnutt Corporation.

Mr. Ulrich's initiative in furnishing this information is insufficient to fulfill the requirements of 15 U.S.C. § 80a–15(c):

". . . It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company."

■ Plaintiff contends that a finding of failure to comply with this section, standing alone, establishes a *per se* violation of the Act, and therefore the advisory contract is voidable at her instance on behalf of the Fund, pursuant to 15 U.S.C. § 80a–46(b):

"Every contract made in violation of any provision of this subchapter . . . shall be void (1) as regards the rights of any person who, in violation of any such provision . . . shall have made or engaged in the performance of any such contract . . . ."

■ The legislative history of the 1970 amendments to the Act does not support such a conclusion. One of the most important additions to the Act made in 1970 was the section under which plaintiff sues, 15 U.S.C. § 80a–35(b). The purpose of that section was to make it clear that fund managers have a fiduciary duty to the funds they advise; to give shareholders a right to sue for breach of that duty; and to overrule decided cases which had held that if advisory contracts were ratified by the shareholders, or in some states, approved by a vote of disinterested directors, shareholders must show mismanagement and waste of corporate assets before excessive management fees could be recovered. [See *e. g., Saxe v. Brady,* 40 Del.Ch. 474, 184 A.2d 602 (1962); *Meiselman v. Eberstadt,* 39 Del.Ch. 563, 170 A.2d 720 (1961)]. Such a rule was considered unduly restrictive in the mutual fund industry where the fund and its adviser are closely related and arm's length bargaining is normally absent.

"Thus, upon a challenge in court to compensation or payments, the ultimate test, even if the compensation or payments are approved by the directors and stockholders, will not be whether it involves a 'waste' of corporate assets but will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee." 3 U.S.Code Cong. & Admin.News 1970, p. 4910, Senate Report No. 91–184.

Among the factors the Court "may wish to consider" in determining wheth-

er the adviser has fulfilled his fiduciary duty to the fund is "whether the deliberations of the directors were a matter of substance or a mere formality," and it was in an attempt "to assist the directors in discharging their duties" that Congress added to 15 U.S.C. § 80a–15(c) the requirement that the adviser furnish, and the directors consider, relevant information regarding fees and payments to the adviser (3 U.S.Code Cong. & Admin.News 1970, p. 4910).

■ There is no indication whatever in the statute or the legislative history that a violation of § 80a–15(c) was intended to relieve the courts of responsibility to evaluate all the evidence before determining whether there has been a breach of fiduciary duty. Were it otherwise, there would be no need for the statement (3 U.S.Code Cong. & Admin. News 1970, p. 4910):

"The section makes it explicit that the . . . plaintiff has the burden of proving to the satisfaction of the court that the defendant has committed a breach of fiduciary duty."

Such an interpretation of § 80a–15(c) would also make the following sections of § 80a–35(b) meaningless surplusage if all that must be shown is a failure to supply and consider information relevant to the fee, or other advantages to the adviser:

"(1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty. (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances."

Clearly, a court is not "authorize(d) . . . to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees" but is "authorize(d) . . . to determine whether the investment adviser has committed a breach of fiduciary duty in determining or receiving the fee." 3 U.S.Code Cong. & Admin.News, 1970, p. 4902. In doing so, the Court must exercise its traditional function of considering all the evidence in finding whether or not there has been a breach of fiduciary duty.

None of the Fund's directors, interested or otherwise, objected to the increased expense ratio on the ground that the Fund might be losing the advantage of a possible rebate during the unexpired term of the contract then in effect. Nor was it pointed out by Mr. Chestnutt that a rebate would probably be due for 1973. Apparently all that was considered was the disadvantage of the existing limitation to the adviser. The disinterested directors gave only the most cursory attention to the expense ratio increase, never considered opposing Mr. Chestnutt's suggestion or asking for further information regarding Chestnutt Corporation's finances. Mr. Frank G. Fowler, who had no connection with Chestnutt Corporation, became a director of AIF in 1962. He testified (Deposition of March 29, 1974, pps. 19–20):

"Q At the time the voting for the new advisory agreement took place, did you believe that you were giving up some advantage that the fund had?

A No.

Q Did you believe you were obtaining some advantage for the fund before voting for the new agreement?

A I'm sure I must have felt that.

Q What did you understand the advantage of the fund to be of having a

one and a half percent expense limitation instead of a one percent expense limitation?

A Well, the advisor cannot operate at a loss, and judiciously, it appeared that he needed more compensation to actively perform his duties as an advisor to the fund.

Q Was it your understanding that prior to June '73 that the advisor was operating at a loss?

\* \* \* \* \* \*

A I believe he was approaching it.

Q Did Mr. Chestnutt present any financial or income statements of Chestnutt Corporation, or did he just make a representation?

A I believe that he did, but that I can't recall for sure.

\* \* \* \* \* \*

Q At any time during your time as a director of the fund, was there ever a discussion about obtaining a new advisor for the fund?

A I don't recall any."

Mr. Ulrich testified that the particular type of investment advice supplied by Chestnutt Corporation was "very unique" and unavailable from any other adviser. Therefore he never considered changing advisers because "if I were to . . . change the type of advice . . . I would be going counter to the desires of the stockholders when they made the initial decision to buy the stock." (Tr. p. 87). See discussion, *supra*, p. 1323, concerning the special nature of Chestnutt's advice. This opinion was shared by the other disinterested directors. The importance the non-affiliated directors placed on retaining Chestnutt Corporation as investment adviser apparently made them susceptible to Mr. Chestnutt's suggestion at the May 21, 1973 board meeting that if the expense ratio were not increased (Deposition of George Chestnutt, July 11, 1973, p. 32):

"inevitably, with the inflation rate out of control, expenses were going up and if contrarily the market kept going down it would be inevitable that somewhere down the road, if things didn't change, that it would reach the unfair proportions of perhaps bankrupting the adviser, or causing the adviser to have to completely get out of the business; that there was a very strong possibility that way down the line something like that could happen, and that I felt that the expense limitation was unfair. . . ."

However, none of the directors made any attempt to determine whether Chestnutt Corporation was in financial difficulty, or intended, absent the modification, to withdraw as adviser. The consolidated balance sheet of Chestnutt Corporation as of December 31, 1972 had been mailed to AIF directors on April 27, 1973. That company's total current assets on December 31, 1972 were $759,564.00. (Ex. 2, p. 11).

Mr. Chestnutt did not submit any more recent financial data to the Fund's board. A draft of the proxy materials was received by the directors before the next meeting on June 5, 1973. This also contained the 1972 balance sheet of Chestnutt Corporation.

Chestnutt Corporation had substantial assets, and Mr. Chestnutt himself did not consider his company to be in any imminent danger of bankruptcy: "it was only the possibility of future trouble that was worrying me. . . . It was the fact that this is the sort of thing that if you don't plan ahead, you are dead and I didn't want to be dead." (Deposition of George Chestnutt, June 4, 1974, p. 17).

In fact, Chestnutt Corporation's income had been decreasing but was still substantial. Fees from AIF for the first quarter of 1972 were $303,680.47; for the first quarter of 1973 they were $284,457.94. Mr. Chestnutt's salary from Chestnutt Corporation at its highest point in 1968 or 1969 was approximately $130,000.00 per year, but dropped to approximately $79,000.00 in 1972 and 1973. (Tr. p. 61).

While the financial stability of its adviser is a matter of legitimate concern

to the Fund, there is no evidence any of the directors questioned Mr. Chestnutt's statements or attempted to verify their significance. Their only concern appears to have been that expenses were rising and thereupon they made the decision, in effect, that the Fund, rather than the adviser should bear the burden of the increase.

The directors of the Fund held a position of trust and confidence with respect to the Fund's shareholders, and owed them the obligations commonly associated with fiduciaries. § 80a–35(b) explicitly imposed upon Chestnutt Corporation the standard traditionally applied to persons in a fiduciary position, and directors of AIF knew or should have known that this is the standard by which their official acts would be measured.

The increase effective September 1, 1973 from 1% to 1½% in the expense ratio limitation was obviously beneficial to Chestnutt Corporation. Nothing in the record indicates any benefit flowing to the Fund from such increase. Mr. Chestnutt's claim that unless the increase were approved, Chestnutt Corporation's continued existence and capacity to function as adviser to the Fund would be threatened, is unsupported.

The issue of contract modification presented a clear conflict of interest between the Fund and Chestnutt Corporation. Such transactions will be upheld only if, after subjecting them to rigid judicial scrutiny, they are found to be fair. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *United Hotels v. Mealey,* 147 F.2d 816 (2d Cir. 1945); *Securities Comm. v. Chenery Corp.,* 318 U.S. 80, 85, 63 S.Ct. 454, 87 L.Ed. 626 (1942).

Seeing its profits dwindling as the Fund's assets declined, it is not surprising that Chestnutt Corporation should want to eliminate the future possibility of a rebate to the Fund, but equity imposes a higher standard. *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928); *Rosenfeld v. Black,* 445 F.2d 1337, 1343–44 (2d Cir. 1971).

In *Rosenfeld, supra,* the Court held the investment adviser to a mutual fund breached its fiduciary duty by realizing a profit in connection with the appointment of a new adviser, and that the applicable standard of fiduciary duty was a matter of federal law incorporating wherever appropriate equitable safeguards long known to the common law, as had been held in *Brown v. Bullock,* 294 F.2d 415 (2d Cir. 1961). The Court noted that (*Rosenfeld, supra,* at 1345):

"When Congress, in § 15(a), required shareholder approval of any new advisory contract, it must have meant an approval uninfluenced by any improper motivations on the part of the outgoing adviser-fiduciary."

The same may be said in this case. The desire to improve Chestnutt Corporation's profits was, perhaps, not "improper motivation" of the interested directors here, but to do so without full disclosure and discussion of Chestnutt's financial condition and the likelihood of a refund to AIF coming due under the balance of the agreed term of the then existing contract, was inappropriate. Without this, it cannot be said that, under all the circumstances, the contract was the result of arm's length negotiations. *Pepper v. Litton, supra.*

AIF's board was presented with the suggestion that its adviser faced insolvency, which is patently untrue on the record before this Court, and the right of the Fund to have the 1% limitation apply in the second year of the old agreement was surrendered. It is no answer to say there was a 60-day mutual cancellation clause and the contract was submitted to the shareholders each year. These are requirements of the Act [15 U.S.C. § 80a–15(a)(2) and (3)] and were intended to protect the parties from such eventualities as irreconcilable good faith disputes, good faith dissatisfaction with performance, dissolution of the Fund, or withdrawal by the

adviser from business. It was not intended to be used as a means by which to repudiate a valid unexpired agreement solely in the self-interest of the adviser, since:

" 'in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing,' *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)." *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F.Supp. 773, 777 (S.D.N.Y.1969).

See also 3 Corbin, Contracts, § 568, pp. 331–334 (1960).

 New York law permits parties to modify a contract without consideration, if the modification is in writing (Gen.Obl.Law. § 5–1103, McKinney's Consol.Laws, c. 24–A), but the parties here, because of the fiduciary relationship, could not do so except on reasonable grounds believed in good faith to be mutually beneficial. Under these circumstances it borders on fraud to suggest that the adviser was faced with insolvency during the period for which it had agreed to the 1% limitation. A different situation may exist with respect to the subsequent year.

The new contract ratified by AIF shareholders on July 18, 1973 must be considered a modification of the earlier contract as to the year September 1, 1973 to August 31, 1974 inclusive.

In accordance with 15 U.S.C. § 80a–46, I find that the modification is void and unenforceable against the Fund. Plaintiff is entitled for this reason alone, to recover damages on behalf of AIF in the amount by which expenses exceeded the 1% expense ratio limitation set forth in the original contract during its original term.[6]

*Proxy Rule Violation.*

We now turn to the proxy materials mailed on June 21, 1973. The statements in the proxy materials claimed to be false or misleading are: (1) that the increase in the expense ratio limitation was proposed "as a result of cost increases over which neither the Fund nor the Adviser can exercise control," and (2) that "No higher fees or costs would have been incurred by the Fund had the proposed new Agreement been in effect in 1972." (Ex. 2, p. 6).

 We observe preliminarily that the second statement quoted above and claimed to be misleading was added to the draft of the proxy solicitation materials at the instance of a member of the staff of the SEC in Washington, D. C., assigned to examine the proxy statement. (Ex. 11). Under the circumstances of this case, it is no defense to show that those filing the proxy statement were motivated by loose talk on the part of a government employee. Responsibility for the adequacy of proxy materials is imposed upon those soliciting the shareholders' votes, and not upon government employees who perform what is basically a police function. Defendants had the duty to stand up to the staff member if his suggestions were without merit. Indeed, they did so vigorously and successfully with regard to at least one other suggestion.[7]

---

6. Effective September 1, 1974, still another contract was entered into between the Fund and its adviser. This contract was ratified at a shareholders' meeting held in July, 1974. The validity and effect of this contract and the proxy statement used in connection with the shareholders' meeting at which it was ratified are not in issue in this case.

7. The same staff member apparently attempted to induce the Fund to inform its share-

holders that it paid higher fees to its Adviser than most other funds. This attempt was rejected by defendants' counsel. See Ex. 11 and Tr. p. 9, *et seq.* A memorandum dated June 15, 1973 (Ex. 11) written by Douglas Cram, an attorney employed by Chestnutt Corporation, states that "They [the SEC staff] were basing this statement solely on the rate on the first $50 million [of assets]— and not on any actual calculation of the ef-

Plaintiff also complains of a failure to accede to a request made by the SEC staff to insert a statement in the proxy materials to the effect that the Fund's fees were higher than those paid by similar funds, and a failure to advise the Fund's non-affiliated directors of the SEC's request and of the fact that the fees were high. As to these complaints the Court finds no merit in plaintiff's contentions.[8]

■■■ I find that the statements quoted above are false and misleading. The proposed increase in the expense ratio was not the "result of cost increases over which the Fund nor the Adviser can exercise control," but was primarily the result of the decreasing net asset value of the Fund. The statement that "No higher fees or costs would have been incurred by the Fund had the proposed new Agreement been in effect in 1972" (Ex. 2, p. 6) represents a misleading half-truth and omission in that it fails to disclose that if the old agreement had remained in effect for its unexpired term, a refund would have been due the Fund in 1973.

The paragraph in its entirety is as follows (emphasis added):

"*As a result of cost increases over which nether the Fund nor the Adviser can exercise control,* the Fund and the Adviser have determined that the 1% annual expense ratio limitation in the current Investment Advisory Agreement shall be increased to 1½%. No increase in the fees paid or payable to the Adviser is proposed.

The aggregate of annual operating costs, including the fee of the Adviser, will be limited to 1½% of average monthly net assets in the contract. Heretofore, the Advisory Contract required the Adviser to reimburse the Fund to the extent that total annual expenses (exclusive of interest and taxes) exceeded 1% of average monthly net assets. Under the new agreement, no reimbursement from the Adviser would be required unless and until total annual expenses of the Fund (again, excluding interest and taxes) exceeded 1½% of average monthly net assets. The Investment Advisory fee schedule would not be changed under the new agreement; however, the higher allowable expense ratio limitation would benefit the Adviser by reducing the risk that some or all of the advisory fee would have to be reimbursed to the Fund due to an increase in rates for other expenses or changes in the average account size of American Investors Fund shareholders. *No higher fees or costs would have been incurred by the Fund had the proposed new Agreement been in effect in 1972.*"

With regard to the first statement italicized above, the shareholders should have been told it was the combination of decreasing net asset value and increasing expenses which resulted in a "risk" that the adviser would have to reimburse the Fund. The paragraph as a whole, particularly with the addition of the last sentence, is misleading. That a

---

fective [overall] rate on current levels of [total] assets."

Mr. Cram stated that he knew of no study of the effective rates charged other funds, and requested that the SEC suggest such a study to him. The SEC apparently made no such suggestion, and the matter was dropped.

The fees paid Chestnutt Corporation are computed on a decreasing scale, as follows:
.8 of 1% on the first $50 million
.6 of 1% on the next $50 million
.4 of 1% on the next $200 million
.35 of 1% on the next $200 million
.3 of 1% on net assets in excess of $500 million.

The effective overall rate obviously depends on the current net asset value of the Fund. Exhibit 14 shows that the advisory fees paid by 14 of the 21 funds listed with rates beginning at .5 of 1% and then decreasing could under no circumstances exceed the fees paid by AIF. With its assets at approximately $150,000,000.00 in mid-1973, the effective rate AIF paid Chestnutt Corporation was .6%. In 1972, however, with net assets at $220,000,000.00, the rate would have been lower.

8. See footnote 10 hereof.

refund might be due in 1973 if the old contract remained in effect for the balance of its agreed term of two years was material "in the sense that a reasonable investor might have considered (it) important," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Schlick v. Penn-Dixie Cement Corporation*, 507 F.2d 374 (2d Cir. 1974), in deciding whether to vote in favor of ratification of the proposed new advisory contract.

The quoted paragraph gives no indication whatever that a refund was ever even a remote possibility, under any likely set of foreseeable circumstances, including rejection of the proposed new agreement. In this regard, it was misleading, and false. There is no doubt that Mr. Chestnutt and the other interested directors thought a rebate was likely, or they would not have sought an increase in the expense ratio. The importance they attached to this likelihood is "a major factor in determining whether (it) was a material fact." *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968).

■■■ The Court finds defendants breached the provisions of § 14(a) of the Securities Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a–9 promulgated thereunder, by omitting to disclose in the June 21, 1973 proxy solicitation that the change in the advisory contract might result in loss of a foreseeable rebate to the Fund in the period September 1, 1973 through August 31, 1974. By the terms of § 20(a) of the Investment Company Act [15 U.S.C. § 80a–20(a)], a violation of § 14(a) of the Securities Exchange Act is also a violation of § 20(a) [*Monheit v. Carter*, 376 F. Supp. 334, 340 (S.D.N.Y.1974)]. Therefore, pursuant to 15 U.S.C. § 80a–46, this violation of § 20(a) of the Act also renders the new contract void and unenforceable against the Fund, insofar as concerns the increase in the expense ratio limitation.

*Demand Requirement of Rule 23.1, F.R. Civ.P.*

■■■ Defendants suggest plaintiff may not prevail because of failure to make a timely demand on the directors. See Rule 23.1 F.R.Civ.P.; New York Bus.Corp.Law § 626(c), McKinney's Consol.Laws, c. 4. Important public policies require that the management of a corporation be entrusted in the first instance to the discretion of its directors. To protect these policies, and prevent the initiation and maintenance of strike suits brought solely to humiliate defendants and extract legal fees, such demands followed by refusal are ordinarily a condition precedent to derivative litigation. Here, clearly, demand would have been fruitless and accordingly is excused as unnecessary. Defendants resisted, tenaciously and effectively, plaintiff's attempt to enjoin the shareholders' meeting. This, and their defense of this litigation, taken together with the fact that their own proxy statement and their own acts were brought directly in question by plaintiff's claims, warrants a finding that any preliminary demand on the Fund or its directors would have been futile. *Papilsky v. Berndt*, 59 F.R.D. 95 (S.D.N.Y.1973).

*Expiration Date of Old Contract.*

Defendants contend, based on their interpretation of paragraph 9 thereof, that the original advisory contract would have expired on June 30, 1974, rather than August 31st. That portion provides (Ex. 4, p. 14):

"The Corporation (Fund) agrees to pay to the Investment Adviser and the Investment Adviser agrees to accept as full compensation for all services rendered by the Investment Adviser hereunder for each of the Corporation's fiscal quarters on the last day of each quarter, a fee in an amount determined by applying the following quarterly rates to the value of the Corporation's net assets at the end of

each calendar quarter: * * * provided, however, that the annual fee of the Investment Adviser shall not be more than an amount which, when added to the other charges of the Corporation (exclusive of interest and taxes) shall result in total charges per annum to the Corporation inclusive of the fee of the Investment Adviser (but exclusive of interest and taxes) of 1% of the value of the Corporation's average monthly net assets for any year. For the first quarter in which this Agreement shall be in effect, the foregoing computations shall be made *as if this Agreement was in effect for the entire quarter*. For the quarter and the year in which this Agreement terminates, there shall be an appropriate proration on the basis of the number of days that this Agreement is in effect during the quarter and the year respectively. . . ."

■ It is not clear how defendants derive a June 30, 1974 expiration date from this paragraph.[9] The contract is dated "as of September 1, 1972" and paragraph 11 provides (Ex. 4, p. 15):

"This agreement shall remain in effect for a period of two years from the date hereof. . . ."

Thus, the expiration date of the contract is clearly August 31, 1974, and the 1% expense ratio limitation must be applied for the periods during which the contract would have been in effect.

■ Defendants complain that such an interpretation would have the effect of providing for an expense limitation of 1% for part of calendar 1974 and a 1½% limitation for the latter part of calendar 1974, a result not contemplated by the parties. Whether the parties contemplated such a result or not, the agreement is so drafted by competent attorneys, it is not ambiguous, and must be construed as it is written.

■ The Fund kept its books and rendered its financial statements quarterly, on a calendar year basis. According to paragraph 9, computations are to be made *as if* the agreement had been in effect on July 1, 1972, but that does not imply the fee would be paid from July 1st, nor does it imply the agreement was in effect on July 1st. Paragraph 9 explicitly provides that when the agreement terminates, the fee and expense limitation shall be prorated "on the basis of the number of days that this agreement is in effect during the quarter and the year respectively." Any such need to prorate would be obviated if the agreement terminated on June 30th, which is the end of a quarter. We will not assume the parties included gratuitous language in so vital a section of the agreement as the advisory fee paragraph.[10]

---

9. The Annual Report of American Investors Fund, Inc. for December 31, 1973 (Ex. 13) "Notes to the Financial Statements, Note 3", discusses the effect of the new agreement as follows:

"At the Annual Meeting of Shareholders held on July 17, 1973 the shareholders approved a new investment advisory agreement for a term of two years effective September 1, 1973 *retroactive to July 1, 1973*. The new agreement is similar in all respects to the prior agreement with the exception of the limitation ratio of expenses as related to average monthly net assets which was increased to 1½% from 1% as provided in the prior agreement. Accordingly, *the adviser is required to refund each year any amount by which total expenses of the Fund*, exclusive of taxes and interest, *exceed 1½% of average monthly net assets for the period July 1, 1973 to December 31, 1973 and 1% of average monthly net assets for the period January 1, 1973 to June 30, 1973.*" [Emphasis supplied.]

There is no justification in either of the contracts for such an interpretation. Specifically, nowhere in paragraph 9 or elsewhere is there a provision that the contract shall be retroactive to July 1, 1973.

10. Conceivably if the contract had been terminated prior to expiration, by giving sixty days notice, or by impossibility of performance,

Reading the paragraph as a whole, it can only mean the first payment to the adviser under the contract was not to be computed on the basis of the average net asset value of the Fund for the month of September only, but on the basis of a figure representing an average of the net asset values for each of the three months in the quarter, July 1st through September 30th.

*Damages; AIF Counsel Fees.*

Equity requires that counsel fees paid or accrued by AIF as expenses for outside attorneys solely for the purpose of this litigation should not be considered as expenses in applying the 1% limitation. As to 1973, it is apparently not disputed that Philadelphia counsel were paid a special retainer of $7,500.00 in connection with the proceedings before Judge Broderick. The Court is requested to allocate $2,000.00 of Mr. Cram's time and $15,000.00 of the billings of general counsel directly to this case.

As to Mr. Douglas Cram, who is described as the Fund's "resident counsel" (Def. Post-Trial Memo., p. 17), the Court declines to allocate any portion of his salary as requested. It is doubtful that the Fund's expenses would be diminished in any amount had Mr. Cram been otherwise engaged.

We are asked (*ibid*, p. 17) to "view $15,000.00 of the $43,735.00 paid to (the Fund's general counsel) for legal services in 1973 to the important function of protecting the rights of 100,000 shareholders to exercise their franchise and have their annual meeting." This we would not be inclined to do unless it could be shown that a specific amount was separately billed and paid in 1973 solely by reason of this action. Since, as will appear below, it is necessary to take additional evidence by stipulation or otherwise, we leave it open to defend-

ants to show how much of the 1973–74 legal expenses are directly attributable to this action and would have been avoided but for the litigation. Plaintiff may not, in good conscience, be the one who pulls the trigger bringing the override provisions into effect.

Plaintiff, by bringing this action in Philadelphia on the eve of the 1973 shareholders meeting, forced the Fund to incur attorneys' fees to assure that the shareholders' meeting would go forward, and avoid the threatened expense of cancelling and rescheduling the meeting. Plaintiff sought an injunction to which she was held not entitled, pursuing that remedy in an inappropriate venue. Plaintiff is partly responsible for AIF's expenditure of counsel fees and the size thereof, at least before the case was transferred to this District. In addition, research discloses no cases in point decided under 15 U.S.C. §§ 80a–35(b), as amended in 1970, and therefore novel issues were raised by this suit. The Court finds this case was defended, here and in Philadelphia, in good faith.

The parties agree no refund would have been due AIF in 1972. Therefore, 1972 is excluded from the damage computation.

Since the expense limitation is to be computed for every calendar year or portion of a calendar year covered by the agreement, damages must be computed first for all of 1973, then separately for January 1, 1974 through August 31, 1974.

Through no fault of counsel to any party, the Court is unable to fix the damages for that portion of 1974 abovementioned. Because the parties assumed validity of their own differing interpretations given the old contract, the record does not contain sufficient information upon which the Court may make an award including those months. This

---

supervening illegality, force majeure, etc., the pro-ration clause would be useful. But

its plain meaning is not limited to such premature termination.

is so notwithstanding agreement made with the Court at the trial (Tr. p. 183).

*Conclusion.*

. Counsel are requested to submit a stipulation in writing setting forth the applicable amounts in accordance with this opinion, or if such a stipulation cannot be mutually agreed upon, so to advise the Court within twenty (20) days from the date hereof so consideration may be given as to how such data may be elicited.

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

## SUPPLEMENTAL FINDINGS AND CONCLUSIONS

Prior findings and conclusions filed herein July 23, 1975, are modified and amplified as hereinafter set forth.

The correct figure for 1973 average net assets is $166,058,784.00. The 1% limitation based upon this amount would be $1,660,587.00.

The Court approves the practice followed in taking the sum of 13 figures and dividing by 13 to obtain the average monthly assets for the year 1973. This is the method which the Fund has used for many years prior to the commencement of this litigation, and may be regarded as having been within the contemplation of the parties when the contract sued upon was signed. It is not totally unreasonable. The alternate method suggested by plaintiff would in effect give consideration only to end of month dates for eleven months, and would produce a distorted and unreasonable result.

Plaintiff has consented to deduct from expenses for 1973 the sum of $12,500.00 as attorneys' fees directly attributable to this litigation. This includes $7,500.00 paid to Philadelphia counsel, and $5,000.-00 allocable to general counsel to the Fund. The Court regards these sums as reasonable. The fee of Philadelphia counsel was fixed and paid at arms length. While general counsel invested additional time in the matter, much of it concerned conferences with Philadelphia counsel, and duplicative work performed jointly with Philadelphia counsel. Furthermore, the same attorneys were, at least indirectly, representing the interests of Chestnutt and his corporation at the same time. Under all the circumstances present here, an allowance of $5,-000.00 is reasonable and adequate.

Accordingly, the damages for 1973 are to be computed as follows:

Expenses net of interest
and taxes per Ex. 15, p. 3 $1,691,417.00
Less: Legal Fees . ` 12,500.00
$1,678,917.00

Subtract, 1% limitation, 1,660,587.00

Rebate for 1973 (Damages) $ 18,330.00

With respect to the damages for that portion of 1974, the agreement clearly contemplated a pro rating of expenses through its termination. See p. 26, *et seq.* and fn. 10 of Findings and Conclusions dated July 23, 1975.

Generally accepted accounting principles consistently applied must be followed. This requires accruals where appropriate. For purposes of the advisory agreement, expenses are · expenses, and there is no provision therein excluding unusual or non-recurring expenses. The Fund spent substantial amounts in 1974 to liquidate the holdings of small shareholders in order to save future expenses. To the extent the Fund treated those costs as expenses during the applicable period, they remain just that. The Court sees no basis to require the exclusion of those items from the damage computation, and will treat the accrual in the third quarter as a *pro rata* expense.

As to 1974 legal fees, we are advised that no bill has been rendered to the advisor, represented, properly, by the

same counsel in the subsequent trial. Recognizing the stakeholder status which the Fund acquired as soon as the injunctive aspect of this litigation was resolved, the Court finds, solely for the purposes of this computation, that the sum of $3,000.00 is a reasonable amount to pay for its representation in this litigation during the first eight months of 1974, and will treat that sum as being exempted from the expenses subject to the limitation.

The rebate for the first eight months of 1974 is calculated as follows:

| | |
|---|---|
| Expenses for 1st six months on accrual basis, net of interest and taxes | $ 800,204.00 |
| Redemption program accrued (⅔ x 39,068.73) | 26,045.82 |
| Advisory fee accrued for July and August (Schedule attached to 8/15/75 letter from Chestnutt's counsel to plaintiff's counsel to plaintiff's counsel) | 104,851.00 |
| Total | $ 931,100.82 |
| Total [carried forward] | $ 931,100.82 |
| Less allowance for legal expenses | — 3,000.00 |
| | $ 928,100.82 |
| Expense Limitation (¶13 of Defendant's post trial exhibit at 8 months basis, or 8/12ths of 1%) | —869,758.80 |
| Rebate for 1974 (Damages) $ | 58,342.02 |

The Court declines as a matter of discretion to award pre-judgment interest.

Settle a final judgment on five (5) days notice in favor of American investors Fund, Inc. and against Chestnutt Corporation, in the amount of $76,672.00. The judgment may contain appropriate provisions retaining jurisdiction to award legal fees and disbursements to plaintiff out of the recovery following appellate finality, and upon notice.