545 F.2d 807
 Fed. Sec. L. Rep. P 95,768
Mildred GALFAND, on behalf of herself and on behalf of
American Investors Fund, Inc., Plaintiff-Appellee
and Cross-Appellant,
v.
CHESTNUTT CORPORATION, Defendant-Appellant,
and
American Investors Fund, Inc., Nominal Defendant.
 Nos. 202, 315, Dockets 76-7156, 76-7170.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 6, 1976.
Decided Nov. 4, 1976.
 
 Clendon H. Lee, New York City, for defendant-appellant.
 Ronald Litowitz, New York City (Kreindler & Kreindler and Edward A. Grossmann, New York City, Lyman & Ash, Philadelphia, Pa., of counsel), for plaintiff-appellee and cross-appellant.
 Before KAUFMAN, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest. The typical fund ordinarily is only a shell, organized and controlled by a separately owned investment company adviser, which selects its portfolio and administers its daily business. Compensation for these services is determined under an advisory contract, the terms of which are all too often dictated to unwary or negligent fund directors and fund shareholders by the investment adviser.
 
 
 2
 The vulnerability of mutual fund shareholders to unscrupulous advisers prompted Congress to enact Section 20 of the Investment Company Amendments Act of 1970, 15 U.S.C. § 80a-35(b),[1] imposing a fiduciary duty on the investment adviser with respect to its receipt of compensation for services rendered to the fund. We are called upon to consider whether, in securing a mid-term modification of its advisory contract with American Investors Fund, Inc. (AIF), Chestnutt Corporation observed its duty of uncompromising fidelity to the interests of AIF security owners. In addition, we are required to decide whether the proxy statement sent to AIF shareholders contained material misstatements or omissions in violation of 15 U.S.C. § 80a-20(a) and the Security and Exchange Commission's Rule 14a-9. We hold that Chestnutt Corporation abused its position of trust by acquiring from the mutual fund, without full disclosure to the AIF Board of Directors, a patently one-sided revision of the advisory contract and that it subsequently violated Rule 14a-9 in obtaining shareholder ratification of the new contract on the basis of a misleading proxy statement. Accordingly, we affirm the judgment of the district court. We also remand, for the reasons hereinafter set forth, for a recalculation of damages.
 
 I.
 
 3
 A brief recitation of the facts will facilitate understanding the legal issues presented for review. AIF was founded in 1957 by George A. Chestnutt, Jr., who became and remains both a Director and President of the Fund. Like other mutual funds, AIF provided small investors an opportunity to pool their venture capital to obtain the benefits of professional financial advice and diversification at a relatively modest cost. The Fund was unusual, however, in that it offered its security holders an investment strategy inspired by the principles of what was characterized as Chartism.[2]
 
 
 4
 This policy was devised by Mr. Chestnutt, who managed the Fund's investments through his control of the investment adviser, appellant Chestnutt Corporation.[3] The adviser, in addition to supervising the Fund's portfolio, furnished office space and clerical personnel, and paid both the salaries of the Fund's executives and all promotional expenses relating to Fund sales.[4] In return, Chestnutt Corporation received quarterly reimbursement of its expenses and a fee calculated as follows:
 
 
 5
 The fee was subject, however, to an "expense ratio limitation".[5] Total charges to the Fund, including the fee, but excluding interest and taxes, could not exceed 1% of the value of the Fund's average monthly net assets for any year. Chestnutt Corporation's successful effort to increase this expense ratio limitation to 1 1/2% spawned the current litigation.
 
 
 6
 Prior to 1973, Chestnutt Corporation's fee was not seriously threatened by the expense ratio limitation. But by May of that year a general deterioration of securities prices had resulted in a sharp decline in the value of the Fund's assets.[6] Inflation simultaneously was causing a rapid increase in the adviser's expenses. In an effort to limit rising costs, Chestnutt Corporation initiated a program of redemptions designed to eliminate shareholder accounts too small to justify service costs. The economies thus achieved, however, caused still greater reduction in the Fund's net asset value. This ominous conjunction of factors led Mr. Chestnutt to believe that, under the 1% expense ratio limitation provided by the two-year advisory contract in force since September 1, 1972, Chestnutt Corporation would be required to begin paying rebates to the Fund within two years.
 
 
 7
 To forestall this eventuality, Mr. Chestnutt decided to increase the expense ratio limitation to 1 1/2%. Acquiescence of the AIF Board of Directors was not difficult to obtain. Chestnutt first proposed revision of the advisory contract at the May 21, 1973, Board meeting. The measure was approved without any difficulty at the next meeting, on June 5. The directors of the Fund gave the proposal cursory scrutiny at best. Mr. Chestnutt at no time gave any indication that by this action, the Fund was foregoing a possible rebate in 1973; nor did he present any evidence to support his gloomy assertions that current trends threatened the financial viability of the investment adviser.[7] It is clear from the record that Mr. Chestnutt's personal domination was such that the directors never considered for a moment opposing his suggestion.
 
 
 8
 Having secured the Board's consent, Mr. Chestnutt sought shareholder ratification of the proposed increase in the expense ratio limitation. The next Annual Meeting was scheduled for July 17, 1973. On June 21 proxy materials were mailed to the Fund's security holders. The materials justified the contract revision as one resulting from "cost increases over which neither the Fund nor the Adviser can exercise control," ignoring entirely the decline in the Fund's net asset value, an equally prominent factor in the "squeeze" on Chestnutt Corporation's profits. The proxy statement added, moreover, that "no higher costs would have been incurred by the Fund had the proposed new agreement been in effect in 1972," although Chestnutt knew the amended contract was likely to increase the ultimate compensation due the investment adviser in 1973.
 
 
 9
 Despite the effort of appellee Mildred Galfand, suing derivatively on behalf of the Fund, to secure a preliminary injunction,[8] the Annual Meeting was held as scheduled on July 17 and the new advisory contract was ratified by a wide margin. The modification in the expense ratio took effect on September 1, 1973. Galfand, meanwhile, continued to pursue her remedy at law. A change in venue from the Eastern District of Pennsylvania to the Southern District of New York was subsequently granted, Galfand v. Chestnutt, 363 F.Supp. 296 (E.D.Pa.1973), and on July 23, 1975, Judge Brieant, after a trial without a jury, found that Chestnutt Corporation breached its fiduciary duty to AIF in securing the expense ratio increase and made false and misleading statements in the proxy materials to obtain shareholder approval of the revamped advisory agreement, in violation of 15 U.S.C. § 80a-20(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9 (1976).[9]
 
 II.
 
 10
 Congress, in imposing a fiduciary obligation on investment advisers, plainly intended that their conduct be governed by the traditional rule of undivided loyalty implicit in the fiduciary bond.[10] It is axiomatic, therefore, that a self-dealing fiduciary owes a duty of full disclosure to the beneficiary of his trust. Former Chief Judge Friendly stated the principle succinctly:
 
 
 11
 under the scheme of the Investment Company Act an investment adviser is "under a duty of full disclosure of information to . . . unaffiliated directors in every area where there was even a possible conflict of interest between their interests and the interests of the fund" a situation which occurs much more frequently in the relations between a mutual fund and its investment adviser than in ordinary business corporations . . .
 
 
 12
 Fogel v. Chestnutt, 533 F.2d 731, 745 (2d Cir. 1975), cert. denied, --- U.S. ----, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976), (citing Moses v. Burgin, 445 F.2d 369, 376 (1st Cir.), cert. denied, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971)).[11] Moreover, even where a fiduciary has made full disclosure, it is the duty of a federal court to subject the transaction to rigorous scrutiny for fairness. See Pepper v. Litton, 308 U.S. 295, 306-07, 60 S.Ct. 238, 84 L.Ed. 281 (1939).[12] We believe it is clear that, in applying these standards, Chestnutt's conduct in obtaining approval of the contract modification must be found to have fallen far short of the elevated norm Congress expected.
 
 
 13
 A thorough search of the record reveals no evidence that Chestnutt, in discussing the issue with the AIF directors, made any reference to the fact or even suggested that the Fund would lose a rebate if the expense ratio were raised to 1 1/2% of average monthly net assets. And, although the financial soundness of the investment adviser is of proper concern to a mutual fund, Chestnutt failed to support his Cassandran prophecies of possible bankruptcy with financial statements or corroborating figures. Had he supplied the AIF Board of Directors with data more recent than the 1972 annual report, it would have been apparent that Chestnutt Corporation had ample assets[13] and substantial income despite recent unfavorable trends. Chestnutt appears to have ignored completely his duty to promote responsible directorial judgment by supplying information sufficient to enable the Fund's Board to evaluate the new contract "with an eye eager to discern . . . rather than shut against" the interests of AIF. Fogel v. Chestnutt, supra at 749. His influence with the Fund's directors can hardly be questioned. The result of this dereliction was a patently one-sided revision of the advisory contract which placed the entire burden of rising costs and a falling market on the Fund, whose financial condition was not accorded even a passing concern.
 
 III.
 
 14
 Chestnutt asserts that to upset the advisory contract approved by the shareholders is tantamount to judicial meddling with corporate democracy. The irony of such an argument will become apparent after examination of the proxy materials, particularly when scrutinized in the light of the rules promulgated by the Securities and Exchange Commission to assure fair corporate suffrage by accurate explanation to the shareholder of issues upon which his vote is sought. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 381, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).
 
 
 15
 We set out in full the relevant paragraph of the proxy statement purporting to advise AIF security holders of the rationale for the proposed increase in the expense ratio limitation:
 
 
 16
 As a result of cost increases over which neither the Fund nor the Adviser can exercise control, the Fund and the Adviser have determined that the 1% annual expense ratio limitation in the current Investment Advisory Agreement shall be increased to 1 1/2%. No increase in the fees paid or payable to the Adviser is proposed. The aggregate annual operating costs, including the fee of the Adviser, will be limited to 1 1/2% of average monthly net assets in the contract. Heretofore, the Advisory contract required the Adviser to reimburse the Fund to the extent that total annual expenses (exclusive of interest and taxes) exceeded 1% of average monthly net assets. Under the new Agreement, no reimbursement from the Adviser would be required unless and until total annual expenses of the Fund (again, excluding interest and taxes) exceeded 1 1/2% of average monthly net assets. The Investment Advisory fee schedule would not be changed under the new agreement; however, the higher allowable expense ratio limitation would benefit the Adviser by reducing the risk that some or all of the advisory fee would have to be reimbursed to the Fund due to an increase in rates for other expenses or changes in the average account size of American Investors Fund shareholders. No higher fees or costs would have been incurred by the Fund had the new Agreement been in effect in 1972.
 
 
 17
 Judge Brieant found the italicized portions of this proxy statement false and misleading under Rule 14a-9.[14] The district judge determined that the shareholders should have been informed that the new expense ratio was sought to avoid penalizing the adviser not only for cost increases beyond its control but also for depreciation of the Fund's net assets. In addition, according to Judge Brieant, the security holders should have been told that a refund might be due in 1973 if the 1% expense ratio term had remained in force for the duration of the old contract.[15]
 
 
 18
 But the appellants argue vigorously that these findings are infirm because Judge Brieant, lacking the guidance of the Supreme Court's opinion in TSC Industries v. Northway, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), evaluated the materiality of the omitted facts under an erroneous standard. It is true, of course, that the test applied below omissions are material if "a reasonable investor might have considered them" so was repudiated in TSC Industries. The correct formulation was enunciated by the Supreme Court thus:
 
 
 19
 (An) omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. Id. at 449, 96 S.Ct. at 2133, 48 L.Ed.2d at 766.
 
 
 20
 We are of the view that even under the TSC Industries test, the proxy statement here was materially misleading.
 
 
 21
 In so holding, we have the benefit of Judge Brieant's careful appraisal of the key paragraph in the proxy statement. This paragraph deceptively stated Chestnutt's avowed reason for fearing the possibility of a future rebate by omitting to mention the primary component of the rebate formula declining Fund assets a subject of considerable interest to shareholders who were being asked effectively to increase the fee of their investment adviser. And the adversion to the absence of a rebate in 1972 if the 1 1/2% limitation had been in effect, without any indication whatever that a refund was even a remote possibility, under any set of circumstances, in 1973 and 1974, was a misleading half-truth. Chestnutt does not seriously dispute the finding that he and the fund directors believed a rebate possible. Indeed, this belief was precisely the reason they desired the expense ratio increase. By presenting some negative factors, the inclusion of these omitted facts certainly would have significantly altered the "total mix" of information made available to voting shareholders. Accordingly, since we find that shareholder approval for the revised advisory contract was secured by means of a materially misleading proxy statement, we affirm the district court's order rescinding the new agreement, 15 U.S.C. § 80a-46(b).
 
 IV.
 
 22
 There remains the issue of damages for us to deal with. There is no dispute regarding Judge Brieant's finding that in 1973 Chestnutt Corporation was unjustly enriched under the voided contract by $18,330. The controversy revolves around the appropriate figure for 1974, when the challenged advisory contract was superseded on September 1 by a new one whose validity is not here in question. In light of the maze of figures presented by both sides at this appellate stage, we believe that a proper determination of damages must be based upon a clearer, more certain record. Accordingly, we remand for a recalculation of 1974 damages by the district judge. We are able, however, to provide some guidance on the method of computation. The court should include all expenses for July and August, 1974, in calculating the rebate. Moreover, we believe that the advisory fee for those two months should be included in the damage formula. Although the payment due is apparently measured by the value of the Fund's assets at the end of the quarter (i. e. October 1), the fee represented services rendered daily during July and August. We note that the parties contemplated such proration of expenses in their advisory contract:
 
 
 23
 P 9. For the quarter and the year in which this agreement terminates, there shall be an appropriate proration in the basis of the number of days that this Agreement is in effect during the quarter and the year respectively . . .
 
 
 24
 This merely treats the advisory fee as an accrued expense of the Fund.
 
 
 25
 The judgment is affirmed as modified by a recomputation of the damages on remand.
 
 
 
 [1]
 The statute provides in relevant part:
 (b) For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:
 (1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
 (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.
 (3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received from such investment company, or the security holders thereof, by such recipient.
 (4) This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title, or rules, regulations, or orders thereunder, or to sales loans for the acquisition of any security issued by a registered investment company.
 (5) Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.
 (6) No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a-9 and 80a-48 of this title, section 78o of this title, or section 80b-3 of this title, or (B) for an injunction to prohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.
 15 U.S.C. § 80a-35(b).
 
 
 [2]
 Portfolio transactions were executed on the basis of complex formulae derived from statistical records and charts depicting the historical price and volume fluctuations of selected stocks, correlated with technical studies of money supply, credit availability and banking trends
 
 
 [3]
 Mr. Chestnutt was President, Director and 47% owner of the investment adviser
 
 
 [4]
 Paragraph 7 of the Advisory Contract provides:
 
 
 [7]
 The Investment Adviser shall furnish to the Corporation such office space as may be necessary for the suitable conduct of the Corporation's business and all necessary light, heat, telephone service, office equipment and stationery and stenographic, clerical, mailing and messenger service in connection with such office; and pay the salaries of all of the Fund's executives, and pay all promotional, travel, and entertaining expenses relating to Fund sales
 Quarterly Equivalent Net Assets
 Rate Annnual Rate of the Fund
 0.2% 0.8% on the first $50 million
 0.15% 0.6% on the next $50 million
 0.1% 0.4% on the next $200 million
 0.0875% 0.35% on the next $200 million
 0.075% 0.3% on the net assets in
 excess of $500 million.
 
 
 [5]
 The expense ratio limitation is included in Paragraph 9 of the Advisory Contract:
 provided, however, that the annual fee of the Investment Adviser shall not be more than an amount which, when added to the other charges of the Corporation (exclusive of interest and taxes) shall result in total charges per annum to the Corporation inclusive of the fee of the Investment Adviser (but exclusive of interest and taxes) of 1% of the value of the Corporation's average monthly net assets for any year.
 
 
 [6]
 The market value of AIF's assets had declined from $220 million in September, 1972 to less than $150 million in May, 1973
 
 
 [7]
 The district court found Chestnutt Corporation's income had been decreasing but was still "substantial." Fees from AIF for the first quarter of 1973 exceeded $284,000, down only fractionally from the corresponding period in 1972. And Mr. Chestnutt's salary approached $80,000 in 1972 and 1973, a significant sum even when compared to his $130,000 income several years earlier
 
 
 [8]
 Galfand v. Chestnutt, 363 F.Supp. 291 (E.D.Pa.1973)
 
 
 [9]
 Galfand v. Chestnutt, 402 F.Supp. 1318 (S.D.N.Y.1975)
 
 
 [10]
 See Rosenfeld v. Black, 445 F.2d 1337, 1343-45 (2d Cir. 1971), cert. dismissed, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972) (federal standard of directorial fiduciary responsibility incorporates, where appropriate, standards of the common law), and cases cited therein
 
 
 [11]
 In Fogel, mutual fund shareholders alleged that the adviser had violated its fiduciary duty by failing to apprise independent fund directors, 15 U.S.C. § 80a-2, of the possibility of using volume discounts on portfolio brokerage transactions to reduce advisory fees. See also portions of the legislative history describing the obligation of the adviser to supply fund directors with information reasonably necessary to perform their evaluative function, 1970 U.S.Code Cong. & Adm.News, p. 4910
 
 
 [12]
 Congress implicitly approved evaluation of advisory fee structures under traditional equitable standards by disavowing cases which upset management contracts only upon a showing of "corporate waste." See, e. g., Saxe v. Brady, 40 Del.Ch. 474, 184 A.2d 602 (1962); 1970 U.S.Code Cong. & Adm.News, pp. 4901-03
 
 
 [13]
 Chestnutt Corporation's total current assets on December 31, 1972 were $759,564
 
 
 [14]
 Rule 14a-9, 17 C.F.R. § 240.14a-9(a) was promulgated by the Securities and Exchange Commission pursuant to § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and provides:
 § 240.14a-9 False or misleading statements.
 (a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
 The Rule is pertinent here by virtue of Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a-20(a), and the Commission's Rule 20a-1, 17 C.F.R. § 270.20(a)-1, making the proxy rules applicable to securities issued by registered investment companies.
 
 
 [15]
 Appellant argues that he cannot be held liable for the inaccuracy of the last sentence quoted above because the SEC required him to include it in the proxy statement. But it is axiomatic that the issuer of a proxy statement is responsible for the truthfulness of its assertions, see, e. g., Rule 14a-9(b). Moreover, Chestnutt easily could have clarified the sentence to avoid misleading Fund shareholders. Finally, appellant conveniently ignores that the adviser vehemently rejected an SEC request to include in the proxy materials a statement that AIF paid a higher advisory fee than most other mutual funds