**Paul W. ZELL, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**INTERCAPITAL INCOME SECURITIES, INC., Dean Witter Reynolds InterCapital, Inc., Dean Witter Reynolds Organization, Inc., Robert W. Swinarton, Charles A. Fiumefreddo, Dennis H. Greenwald, Robert W. Long, Jonothan R. Page, Vincent M. Marra, Rosalie Sharin, Irwin Friend, Arthur M. Okun and John J. Scanlon, Defendants.**

Nos. C–77–2934–WWS, C–78–1155–WWS.

United States District Court,
N. D. California.

Oct. 24, 1978.

David B. Gold, A Professional Law Corp., David B. Gold, Paul F. Bennett, George Donaldson, San Francisco, Cal., for plaintiff.

Pillsbury, Madison & Sutro, John B. Bates, James J. Walsh, Stanley B. Watson, Stephen Stublarec, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

WILLIAM W SCHWARZER, District Judge.

Paul W. Zell, an owner of one share of stock in InterCapital Income Securities, Inc. (the "Fund"), an investment company, brings this action charging defendants with violation of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and the rules promulgated under it, by failing to disclose material information in two proxy statements.[1] The proxy statements were issued by the Fund's management to obtain shareholder approval of new investment advisory agreements with the Fund's investment manager, the prior contracts having terminated first upon the acquisition of the manager by another corporation

---

1. Plaintiff alleges a violation of a number of other provisions of the federal securities laws as well: Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b) (invalidity of contracts in violation of a provision of the Act); Section 13(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a–13(a) (changes in investment policy by an investment company); Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a·20(a) (solicitation of proxies in violation of the Act's rules); Rule 20a–1(a), 17 C.F.R. § 270.20a·1(a) (solicitation of proxies with respect to an investment company in violation of section 14(a) of the Securities Exchange Act); Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a–35(b) (breach of fiduciary duty by an investment advisor); Section 47(b) of the Investment Company Act, 15 U.S.C. § 80a–46(b) (invalidity of contracts in violation of a provision of the Act). These provisions are not applicable unless a violation is first found of the disclosure regulations promulgated pursuant to Section 14(a) of the Securities Exchange Act. *See* section III, *infra.*

and later upon the merger of the manager's parent with another corporation. Zell argues that the Fund violated Rule 14a–9 of the proxy regulations, which forbids misstatements or omissions of material facts in proxy solicitations, by failing to disclose that litigation was pending against the parent of the Fund's investment advisor and against a second subsidiary of the parent corporation. Defendants have moved for summary judgment.

## I. THE FACTS

The Fund is a publicly traded, closed-end investment company, registered pursuant to Section 8 of the Investment Company Act of 1940, 15 U.S.C. § 80a–8. Approximately 35,000 shareholders own its 8,674,988 shares. It was formed in 1973 (under the name Standard & Poor's/InterCapital Income Securities, Inc.) and until 1977 was managed by Standard & Poor's/InterCapital, Inc. (the "Investment Manager"), a wholly-owned subsidiary of Standard & Poor's Corp. ("S&P").

On June 23, 1977, S&P agreed to sell its ownership interest in the Investment Manager to Dean Witter Organization ("DWO"). Because this proposed sale constituted an assignment of the investment advisory agreement between the Fund and its advisor, Section 15 of the Investment Company Act, 15 U.S.C. § 80a–15(a), required the Fund's shareholders to approve a new advisory agreement.[2] The Fund mailed a proxy statement to its shareholders on or about July 15, 1977. On August 30, 1977, the shareholders approved a new investment advisory agreement between the Fund and its manager, renamed Dean Witter InterCapital, Inc., a wholly-owned subsidiary of DWO. Except for the beginning and ending dates, and the deletion of references to "Standard & Poor's," the old and

new agreements were substantially identical. On September 1, 1977, DWO and S&P consummated the sale, and the name of the Fund was changed to InterCapital Income Securities, Inc.

On January 3, 1978, DWO merged with Reynolds Securities International, Inc. ("Reynolds"). DWO was the surviving corporation under the name Dean Witter Reynolds Organization, Inc. ("DWRO"). The Investment Manager became a subsidiary of DWRO and changed its name to Dean Witter Reynolds InterCapital, Inc. The structure, management, and organization of the Investment Manager, however, remained the same. Once again, the Fund's shareholders were required to approve a new advisory agreement, which was almost identical to the previous one. Proxy statements were mailed on or about November 14, 1977, and on January 3, 1978, at their annual meeting, the shareholders approved the agreement between the Fund and the renamed Investment Manager.

DWRO (formerly DWO) is the parent company of both the Investment Manager and a large brokerage firm, known as Dean Witter & Co., Inc. ("DW") before the merger with Reynolds, and subsequently renamed Dean Witter Reynolds, Inc. ("DWR").

To summarize the essential facts respecting the corporate structure, DWO (now DWRO) at the relevant times was a holding company; DW (now DWR) was its wholly-owned subsidiary engaged in the brokerage business; Dean Witter InterCapital, Inc., the Fund's manager, was another wholly-owned subsidiary of DWO; it had an investment advisory agreement with the Fund, in which plaintiff owned one share of stock.

Plaintiff Zell purchased his share of stock in the Fund on August 29, 1977, one day

---

**2.** Section 15 of the Investment Company Act, 15 U.S.C. § 80a–15(a), provides in pertinent part:

"(a) It shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract, whether with such registered company or with an

investment adviser of such registered company, has been approved by the vote of a majority of the outstanding voting securities of such registered company, and—

\* \* \* \* \* \*

(4) provides, in substance, for its automatic termination in the event of its assignment."

prior to the first ratification vote on a new advisory agreement. On December 29, 1977, he filed an action (No. C–77–2934) in which he attempted unsuccessfully to enjoin the voting of proxies at the second shareholders' meeting, scheduled for January 3, 1978. He then sought to amend his complaint to assert the same deficiencies in the proxy statement for the August 30, 1977, meeting as in the later proxy statement. That motion was denied. On May 25, 1978, he filed a new complaint (No. C–78–1155) which alleges the same material omission from each proxy statement.

Zell contends that both proxy statements were false and misleading, in contravention of Rule 14a–9 of the proxy regulations, in failing to disclose that DWO and its brokerage subsidiary (and, with reference to the second proxy statement, Reynolds and its subsidiary) had been named as defendants in numerous lawsuits. In its proxy materials recommending approval of the new advisory agreement (necessitated by the purchase of the Investment Manager by DWO), the Fund's management stated:

> "In connection with the foregoing, the Directors have considered the fact that Dean Witter [the parent] is a large, well established company with substantial resources. The independent Directors believe that it is responsibly managed, and that its management has a continuing interest in investment management operations. In the judgment of the independent Directors, Dean Witter's financial strength and stability and quality of Dean Witter's management are important factors." First Proxy Statement at 5.

The proxy statement mentioned a pending lawsuit against the Investment Manager, but it did not disclose the existence of any litigation pending against the parent of the Investment Manager, DWO, or its brokerage subsidiary, DW.

As shown by DWO's Form 10–K, filed with the Securities and Exchange Commission ("SEC") for the fiscal year ending August 31, 1977, as of July 15, 1977, the approximate date the Fund mailed the proxy statement, at least 22 lawsuits were pending against DW. The parties dispute whether DWO was also named as a party to these actions; for purposes of this motion, the Court will assume that it was.

In the second set of proxy materials recommending approval of the new advisory agreement resulting from the merger of Reynolds and DWO, the Fund's management made substantially similar statements and again failed to mention lawsuits pending against the parent or its brokerage subsidiary, or against Reynolds and its subsidiary. It did disclose a shareholder action against the Investment Manager of the Fund which complained of unreasonably high advisory and management fees.[3]

## II. PLAINTIFF'S STANDING

■ Defendants argue that Zell has no standing to challenge the first proxy statement because he was not a shareholder with voting rights at the time of the meeting. He purchased his share of stock on August 29, 1977, but only shareholders of record on July 15, 1977, were entitled to vote at the August 30, 1977, meeting. Defendants cite *Wulc v. Gulf & Western Industries, Inc.*, 400 F.Supp. 99, 104 (E.D.Penn.1975), which held that since an option holder had no

---

**3.** Zell points out, by way of contrast, the description of litigation found in DWO's proxy statement issued December 28, 1977, in connection with the Reynolds merger:

> "Many aspects of DW's business involve substantial risks of potential liability. In the normal course of its business DW has been named as defendant in numerous civil actions arising out of its activities as a broker and dealer in securities, as a commodities futures commission merchant, as an investment banker, as an employer and by reason of its

memberships in various securities and commodities exchanges. A considerable number of these actions allege damages in substantial or indeterminate amounts and many are, or purport to be, class actions brought on behalf of all persons similarly situated.

> "DWO believes that the eventual outcome of the civil actions against DW will not, in the aggregate, have a material adverse effect on the consolidated financial position of DWO." Proxy Statement at 31–32.

suffrage rights, he could not pursue a private cause of action under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n. *Wulc* stated that "to have standing under § 14(a), the plaintiff is required to be a shareholder with voting rights in order to establish a nexus with the statute." *Id.* at 103. The rationale underlying defendants' argument is the Supreme Court's frequent pronouncement that Section 14(a) was enacted to protect corporate suffrage. *J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), for example, stated, quoting a House Report, that Section 14(a) "was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders.' "

As a shareholder of record on November 11, 1977, Zell clearly has standing to challenge the second proxy statement, which involved the January 3, 1978, annual meeting. Unlike the option holder in *Wulc*, Zell has challenged the first proxy statement (with regard to which he did not have voting rights) and the second proxy statement through a class action, brought "on behalf of himself and all other persons entitled to receive notice of and to vote at the Annual Meeting of the Fund's stockholders held on January 3, 1978 and/or the Special Meeting of the Fund's stockholders held on August 30, 1977." Complaint in No. C–78–1155 at 4–5. The asserted interest of Zell and other stockholders entitled to vote only at the January 3 meeting is the same as that of stockholders entitled to vote at the August 30 meeting, since both proxy statements allegedly suffered from the same material omissions. Thus, defendants' attack on Zell's standing based on a lack of voting rights has little substance.

In other contexts, courts have not required the named plaintiff to show stock ownership contemporaneous with every alleged wrong, so long as other members of the class can prove this ownership and the claims of the named plaintiff are similar to those of other class members. In the interest of judicial economy and consistent judg-

ments, courts have allowed the named class representative to assert the similar claims of other class members. *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) (citations omitted), a class action alleging assorted Rule 10b–5 misrepresentations over a 27-month period, stated that "[c]onfronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." Similarly, in another antifraud suit, *Commerce Capitol Corp. v. Airways Enterprises, Inc.*, [Current Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 96,411 at 93,476 (S.D.N.Y.1978), the court enlarged the class of plaintiffs to include investors who had made their purchases before the named class representative. The court stated that although these investors had relied on a different prospectus, the alleged fraud was similar and the named plaintiff would develop facts which applied to the losses suffered by all investors. *In re Penn Central Securities Litigation*, 347 F.Supp. 1327 (E.D.Penn.1972), *modified on other grounds*, 357 F.Supp. 869 (E.D.Penn.1973), *aff'd*, 494 F.2d 528 (3d Cir. 1974), cited by defendants, does not support their claim that the named class representative in a Section 14(a) action must have had voting rights with respect to each alleged proxy violation. That decision dealt only with whether plaintiffs had a cause of action under Section 14(a) based on the purchase or sale of securities as a result of deceptive proxy statements. *Id.* at 1340–42.

■ Defendants also contend that Zell has no standing both to sue the Fund in his class action and to bring derivative claims in behalf of the Fund, in which he asks the Court to declare void the advisory agreements and to order the Investment Manager to return all fees received pursuant to

these illegal contracts. They argue that the two actions are inconsistent because, if successful, the class action would result in a recovery against the Fund while the derivative suit would result in a recovery for the Fund.

Defendants ignore the fact that the derivative claims ask for the same relief as the class action claims: the voiding of the previous investment advisory agreements, the issuance of a new proxy statement disclosing the litigation pending against DW and DWO, and the return to the Fund of all advisory fees. They also fail to see that these claims are logically consistent: if the prior agreements were obtained through deceptive proxy statements issued by defendant Fund, the Investment Manager has no right to the advisory fees. In an action under Section 14(a), "federal courts have the power to grant all necessary remedial relief." *J. I. Case Co. v. Borak, supra,* 377 U.S. at 435, 84 S.Ct. at 1561. Unlike plaintiff in *Petersen v. Federated Development Co.,* 416 F.Supp. 466, 475 n. 6 (S.D.N.Y. 1976), Zell does not face a conflict of interest in bringing an action both against the corporation and in favor of it, for he does not seek to recover personally against the Fund.

Accordingly, defendants' objections based on lack of standing must be rejected.

## III. *PLAINTIFF'S CLAIM OF NON-DISCLOSURE*

Plaintiff charges that the omission of information about litigation pending against the parent of the Investment Manager and a sister subsidiary resulted in the proxy materials being false and misleading. He contends that by holding out DWO as a large, well-established company with substantial resources while failing to disclose litigation subjecting DWO and DW to contingent liabilities in large sums which could adversely affect DWO's financial position and cast doubt on the quality of DWO's investment management skills, the proxy materials on the basis of which the Fund's shareholders approved the advisory agreements were false and misleading. The

question before the Court is whether this omission violates the rules governing proxy solicitation under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n.

### A. *SEC Rules Governing the Solicitation of Proxies*

Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n, states that it shall be illegal for any person to solicit proxies "in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." Congress intended this provision "to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970), *quoting* H.R.Rep.No.1383, 73d Cong., 2d Sess. at 14 (1934).

Pursuant to Section 14(a), the SEC has issued regulation 14A, which sets forth the information required to be disclosed in connection with the solicitation of proxies. Rule 20a–1 of the Investment Company Act, 17 C.F.R. § 270.20a–1(a), provides that all SEC rules and regulations adopted pursuant to Section 14(a) shall apply to solicitations made by a registered investment company such as the Fund.

#### 1. *Rule 14a–3 and Schedule 14A.*

■ Rule 14a–3, 17 C.F.R. § 240.14a–3(a), provides that no proxy solicitation shall be made unless each person solicited is furnished with a written proxy statement containing the information specified in Schedule 14A, 17 C.F.R. § 240.14a–101. Schedule 14A requires an issuer to set forth a wealth of information in the proxy statement, not including, however, contingent liabilities (or, for that matter, financial information) of third parties, or of anyone in the position here occupied by the Investment Manager, DWO or DW. The detail required by Schedule 14A, such as the revocability of the proxy, the dissenters' right of appraisal,

the identity of persons making the solicitation, the financial interest of management and nominees in matters to be voted upon, the remuneration and other transactions with management, and the issuer's relationship with independent public accountants, clearly shows that the SEC knew how to go about requiring disclosure of those matters it thought should be disclosed. It must therefore be concluded that in the absence of a specific requirement covering litigation involving persons such as DWO or DW, who are neither the issuer nor a subsidiary, disclosure is not required by the terms of the regulation.[4]

### 2. Rule 14a–9: Omission of Material Facts

■ Disclosure may nonetheless be required if it relates to a material fact necessary to avoid making the proxy statement misleading. Rule 14a–9, 17 C.F.R. § 240.-14a–9(a), states:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted), defined the test of materiality under this rule:

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* general description of materiality as a requirement that 'the defect have a significant *propensity* to affect the voting process.' It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

■ A threshold question is whether the issue of materiality may be decided on summary judgment. In *TSC Industries*, the Court characterized the issue as a "a mixed question of law and fact," and said:

---

4. Even where the proxy regulations require the furnishing of financial statements, as in the case of an issuance of securities, merger, consolidation or acquisition, only statements of the issuer and its subsidiaries are required. Item 15(a) of Schedule 14A requires the issuer to "furnish certified financial statements of the issuer and its subsidiaries such as would currently be required in an original application for the registration of securities of the issuer under the [Securities Exchange] Act." Regulation S–X, 17 C.F.R. § 210, details the form and content of these financial statements. Rule 4–02 of Regulation S–X, 17 C.F.R. § 210.4–02(a), states that the "registrant shall follow in the consolidated financial statements principles of inclusion or exclusion which will clearly exhibit the financial position and results of operations of the registrant and its subsidiaries." No express requirement exists for disclosure of financial information concerning corporations other than the issuer and its subsidiaries.

Similarly, where the proxy solicitation relates to an annual meeting at which directors are to be elected, an annual report must accompany the proxy statement. Rule 14a–3, 17 C.F.R. § 240.14a–3(b)(1), provides in part:
"Consolidated financial statements of the issuer and its subsidiaries shall be included in the report if they are necessary to reflect adequately the financial position and results of operations of the issuer and its subsidiaries, but in such case the individual statements of the issuer may be omitted even though they are required to be included in reports to the Commission."

"Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." 426 U.S. at 450, 96 S.Ct. at 2133 (citations omitted).

While the *TSC Industries* decision analogizes the reasonable shareholder test to the reasonable man test under the law of negligence, ordinarily a question of fact, it also acknowledges the existence of limits on Rule 14a–9 liability mandated by its underlying policy considerations. Thus, where the court finds as a matter of law that no reasonable shareholder could have viewed the omitted information as significantly affecting his decision on how to vote on the proposal, summary judgment may be granted. *Lyman v. Standard Brands Inc.*, 364 F.Supp. 794 (E.D.Penn.1973); *Prettner v. Aston*, 339 F.Supp. 273 (D.Del.1972).

■ The substance of plaintiff's contention is that since the Fund's proxy statement describes DWO as a well-established company with substantial resources, it is misleading to fail to disclose the litigation pending against DWO and its principal subsidiary, DW, disclosed in Form 10–K filed by DWO with the SEC and consisting of some 22 lawsuits pending against DWO or DW, or both, with damage claims aggregating over $200,000,000. Plaintiff's claim is that the failure to incorporate into the Fund's proxy material the information contained in DWO's Form 10–K constitutes a material omission.[5]

That contention raises no genuine issue of material fact. The issue whether a substantial likelihood exists that the omitted information would have assumed significance in the deliberations of a reasonable shareholder on whether to approve the ad-

visory agreement is, in the circumstances of this case, a question of law which the Court can decide on motion. None of the underlying facts is disputed and no additional facts have been offered by plaintiff to warrant a trial.

The purpose of Rule 14a–9 is "to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." *TSC Industries, Inc. v. Northway, Inc., supra*, 426 U.S. at 448, 96 S.Ct. at 2132. But as the Court pointed out, "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *Id.* The standard of materiality therefore requires proof of "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2132 (footnote omitted).

The matters on which the Fund's shareholders were to vote were, first, the approval of an advisory contract with the existing investment manager under new (DWO) ownership and, second, the approval of that contract with the same manager now owned by the merged Witter-Reynolds organizations. Plaintiff contends that a reasonable shareholder, in voting on approval of the contracts, would have wanted to know that either DWO or its brokerage subsidiary DW was involved in substantial litigation.

It is not claimed that any of those lawsuits had any relationship to the activities or operations of the Fund or of the Investment Manager; a single action pending against the Investment Manager was in fact disclosed in the proxy statements. Thus, this case is fundamentally different from any reported case, none of which sup-

---

5. Plaintiff argues that the materiality of the information about litigation involving DWO and DW is established by the fact that Form 10–K requires the disclosure of pending legal proceedings if the total claims exceed 10 percent of the consolidated assets of the registrant and its subsidiaries. *See* 15 U.S.C. §§ 78m(a)(2), 78*o*(d); 17 C.F.R. § 249.310. But the existence of a requirement that an issuer disclose litigation information about itself in its annual report clearly says nothing about the materiality of an omission of that information from a proxy statement issued by another corporation not a party, directly or indirectly, to that litigation.

ports plaintiff's position. In *Tannenbaum v. Zeller,* 552 F.2d 402 (2d Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977), on which plaintiff places his principal reliance, the non-disclosure found to be material to the shareholders' vote on approval of the investment advisory contracts with the fund's manager related to the fund management's decision to forego the opportunity to recapture brokerage commissions on fund transactions. The proxy materials disclosed the brokerage practices followed by the investment manager but did not disclose the available alternative, rejected by the fund's management, of recapturing brokerage commissions. The court found that alternative means of handling commissions bore directly on the agreements with the investment manager and therefore related to the action the shareholders would take. "The disclosure of the recapture alternatives was necessary in order for the shareholders to make an informed decision on whether or not to approve the new management contracts . . . ." *Id.* at 433.

Similarly, in *Galfand v. Chestnutt Corp.,* 545 F.2d 807 (2d Cir. 1976), *cert. denied,* 435 U.S. 943, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978), a material non-disclosure was found where the proxy materials, while disclosing an increase in the percentage rate of the investment advisory fee paid to the manager, did not disclose (1) that one reason for the increase was to avoid penalizing the manager for a decline in the value of the portfolio and (2) that the change might result in the fund's loss of a possible rebate for the coming year. "[T]he inclusion of these omitted facts certainly would have significantly altered the 'total mix' of information made available to voting shareholders." *Id.* at 814.

In *Lyman v. Standard Brands Inc., supra,* 364 F.Supp. 794, on the other hand, the court rejected the claim that it was a material non-disclosure in a proxy seeking shareholder approval of the appointment of an auditing firm, whose New York office would have done the corporation's auditing, to omit the fact that partners in the firm's Oklahoma City office had been indicted in connection with alleged securities frauds and that the firm itself had been named as an unindicted coconspirator. The court's reasoning there in granting defendant's motion for summary judgment is squarely applicable to this case:

"It is always extremely difficult for a court to determine with precision what effect a misstatement or omission might have on a reasonable shareholder in the process of deciding how to vote. We are convinced, however, that the nexus between the three Oklahoma City employees and Andersen's fitness to be Standard Brands' independent auditors is so remote as to render the fact that the indictments were handed up quite unrelated to the substance of the proposal before the shareholders.

"Plaintiff attempts to analogize the set of facts in this case to cases in which the failure to disclose pending litigation against officers and directors has been held to constitute the omission of material facts. The analogy is inapposite. The disclosure of pending litigation against corporate officers and directors, whether they are seeking shareholder approval of a transaction, or are seeking re-election to the Board of Directors, is of great importance because the officers and directors 'collectively are the captain of the [corporate] ship.' *Rafal v. Geneen,* 1972–73 CCH Fed.Sec.L.Rep. ¶ 93,505 at 92,441 (E.D.Pa.1972). Full disclosure of pending litigation is especially important if it has any bearing on the competence or motives or integrity of the soliciting directors. Therefore, in *Robinson v. Penn Central Co.,* 336 F.Supp. 655 (E.D.Pa. 1971), we held that a proxy statement seeking approval of a refinancing plan and the re-election of directors omitted to state material facts and was false and misleading because it failed to disclose that the former directors who negotiated the plan had been named as defendants in lawsuits charging them with fraud and breach of fiduciary duty, and that two members of the Board soliciting the proxies had been elected by the directors-turned-defendants. These facts would

undoubtedly affect a shareholder's judgment of the source and substance of the proposals and had to be disclosed if the shareholders could reasonably be expected to make an informed, intelligent decision. A similar rationale lay behind the court's conclusion in *Beatty v. Bright,* 318 F.Supp. 169 (S.D.Iowa 1970), that a shareholder's vote on a sale of corporate assets might be influenced if he knew that the directors proposing the sale had been named as defendants in lawsuits charging them with fraud, self-dealing, conflict of interest and mismanagement.

"There is, however, a difference between the cases involving the disclosure of pending litigation against officers and directors and this lawsuit. The difference is not that the function of the independent auditor is less significant than that of the director, and therefore pending litigation against the auditor is less important to the shareholder. On the contrary, the auditor, as the counter and guardian of the corporate coins, plays a particularly important role and the consequences of his dishonesty or incompetence can be disastrous. The difference is rather in the connection between the undisclosed facts and the shareholder's decision on how to cast his vote. *Rafal, Robinson* and *Beatty* all involved facts about pending litigation which directly related to the integrity or judgment of the directors of the corporation soliciting the proxies, and therefore went to the heart of the proposals. The connection between the indictment of the three Oklahoma City employees is quite different. The indictment of three employees in an Andersen office which has had no connection with the Standard Brands audit has only the most tenuous relationship to the shareholders' selection of the corporation's independent auditors. Had Andersen employees who

had worked on or might in the future be assigned to the Standard Brands audit been indicted, the existence of that litigation might well be a material fact which must be disclosed to the shareholders. However, the undisclosed fact here is so unrelated to the corporate integrity or fitness of Andersen that we conclude its omission would not have a 'significant *propensity* to affect the voting process.'" 364 F.Supp. at 797–98 (footnote omitted).

Here, too, the connection between the information about litigation against DW and DWO listed in Form 10–K, none of which has a relationship to the Fund, and a shareholder's decision whether to approve the investment advisory agreement between the Fund and the Investment Manager was too remote. That information would not have provided the shareholders with "facts . . . [which] would have significantly altered the 'total mix' of information made available." *Galfand v. Chestnutt, supra,* 545 F.2d at 814.

Plaintiff points to the statement in the proxy describing DWO as a large, well-established and responsibly managed firm with substantial resources and argues that information about the litigation is necessary to avoid making that description misleading.[6] *See* p. 822 *supra.* But the litigation information contained in Form 10–K would not enhance the ability of the Fund's shareholders to evaluate the statement in the proxy material. That information, amounting to over five closely-printed pages identifying lawsuits, listing the parties involved and claims made along with DWO's and DW's denials, has no significance to a reasonable shareholder and would not enhance his ability to make an informed decision on the question whether the advisory agreement should be approved. While it tells the shareholders of the pend-

---

**6.** In granting summary judgment, the Court has viewed the facts most favorably to plaintiff in deciding, as a matter of law, that the failure to disclose the information contained in DWO's Form 10–K was not a material omission. Thus, it is unnecessary to discuss plaintiff's contention that DW, not DWO, was in reality the backbone of the Dean Witter family, serving as the organization's greatest revenue generator and providing DWO and the Investment Manager with many of their directors. Even accepting plaintiff's theory of DW's financial dominance, the Court finds that Form 10–K information would not have been considered material by a reasonable shareholder.

ency of a large number of lawsuits, it tells them nothing of the merits of the claims made in the litigation, the underlying facts leading to the litigation, the likely financial impact on the investment manager, or how, if at all, any of this information may bear on the decision whether to approve the advisory agreement.[7] Aside from being uninformative on its face, moreover, it has a likely tendency by its sheer volume and technical appearance to mislead a shareholder, implying the existence of substantial and relevant claims when in fact none may exist.[8] Thus, it falls within the Supreme Court's reasoning in *TSC Industries, Inc.*:

> "Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good . . . [I]f the standard of materiality is unnecessarily low . . . management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." 426 U.S. at 448–449, 96 S.Ct. at 2132.

It was on the strength of the foregoing considerations that the Supreme Court rejected a materiality standard based on what a reasonable shareholder *"might* consider important" and instead required a finding of "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 426 U.S. at 449, 96 S.Ct. at 2132.

The *TSC Industries, Inc.* decision therefore clearly rejects the catchall approach in favor of requiring a rational nexus between the omitted facts and the decision to be made by the shareholders. Applying that standard, the Court must conclude as a matter of law that there is no substantial likelihood that a shareholder, acting as a reasonable shareholder, would have considered the litigation information in DWO's Form 10–K significant in his deliberations.[9]

The motions for summary judgment will therefore be granted.

IT IS SO ORDERED.

---

7. Plaintiff does not contend that defendants violated any duty owed to plaintiff by not providing that kind of information. His claim is limited to the assertion that omission of the bare litigation information published in DWO's Form 10–K violated the proxy regulations. Inasmuch as that litigation involves neither the issuer of the proxy material nor its subsidiary, the normal rules of confidentiality and privilege would preclude the Fund from gaining access to that kind of information. Attempts at discovery in this litigation into the "materiality" of the DWO and DW litigation would therefore be beside the point. *See* note 9, *infra*.

8. Rule 14a–9, in prohibiting false and misleading information, specifically cites as an example "material which . . . makes charges concerning improper, illegal or immoral conduct . . . without factual foundation." The Fund, having no factual foundation for the charges made against DW or DWO in the liti-

gation listed in Form 10–K, might well run afoul of this prohibition by republishing the information in its proxy material.

9. As previously noted, the only issue before the Court is whether the omission of the litigation information published in DWO's Form 10–K violated the proxy regulations. Plaintiff does not allege that the defendants had knowledge of and omitted particular facts which made the description of DWO in the proxy material misleading, or which should have led them to reject the assurances or representations made to them by DWO; the mere pendency of litigation against DWO does not have that effect, nor does plaintiff allege that the defendant directors were derelict in the performance of their fiduciary duties when they accepted DWO's assurances concerning its financial condition without conducting further investigations. Had claims of this nature been made, a different case would be presented.