**CAMELOT INDUSTRIES CORPORATION,**
Plaintiff,

v.

**VISTA RESOURCES, INC., Arnold A. Saltzman and Lawrence Goldstein,**
Defendants.

**VISTA RESOURCES, INC., a corporation, individually and on behalf of Camelot Industries Corporation, Plaintiff,**

v.

**CAMELOT INDUSTRIES CORPORATION, Salvatore Macera, Robert P. Henderson, and Robert B. Johnson, Defendants.**

No. 82 Civ. 1646 (RWS).

United States District Court,
S. D. New York.

March 29, 1982.

Simpson, Thacher & Bartlett, New York City, for plaintiff; Barry R. Ostrager, New York City, of counsel.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for defendants Vista Resources, Inc. and Arnold A. Saltzman; Jack Weinberg, New York City, of counsel.

Snow, Becker, Kroll, Klaris & Krauss, P. C., New York City, for defendant Lawrence Goldstein; Stanley L. Kantor, New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Camelot Industries Corporation ("Camelot") has moved the court to enjoin a tender offer for Camelot shares made on March 15, 1982 by defendant Vista Resources, Inc. ("Vista"). Vista has cross-moved to enjoin Camelot from holding its annual meeting of April 7, 1982, from implementing any of the management proposals to be presented at the meeting, from voting certain shares and from entering into any transactions to frustrate the tender offer. Both motions will be granted in part on the basis of the findings of fact and conclusions of law set forth below.

In addition, Camelot has by letter expanded its preliminary injunction motion to bar a subsequent proxy solicitation by Vista. This aspect of Camelot's motion will be granted unless curative amendments are undertaken.

### Prior Proceedings and Jurisdiction

The complaint in this action was filed on March 16, 1982, the day following the publication of the tender offer. It alleges violations of Sections 10(b), 13(d), 14(a), 14(d), and 14(e) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. 78j(b), 78m(d), 78n(a), 78n(d), and 78n(e) and the rules and regulations of the Securities Exchange Commission ("SEC") promulgated thereunder. Jurisdiction is conferred on this court by Section 27 of the 1934 Act, 15 U.S.C. 78aa, and by the provisions of 28 U.S.C. § 1331. The amount in controversy, exclusive of interests and costs, exceeds $10,000. Many of the acts alleged have been carried out by use of various means and instrumentalities of interstate commerce, including the mails. Venue is proper in this district pursuant to the provisions of Section 27 of the 1934 Act, 15 U.S.C. § 78aa, since certain of the acts and transactions set forth below took place in this district and the defendants are found in and transact business in this district.

The same day the complaint was filed, the Camelot motion for a preliminary injunction was made, followed on March 18, 1982 by the filing of a counterclaim by Vista and its cross-motion for injunctive relief. Expedited discovery was held. A hearing was conducted on March 24, 1982 at which the defendant Arnold A. Saltzman ("Saltzman"), defendant Lawrence Goldstein ("Goldstein") and counterclaim defendant Salvatore Macera ("Macera") testified and depositions and exhibits were admitted into evidence.

### The Parties

Camelot is a Delaware corporation with its principal place of business at One Burlington Woods Drive, Burlington, Massachusetts. It is engaged in the business of designing, manufacturing and distributing eyeglasses, vision aids and other precision optical products. Camelot was formerly a subsidiary of Itek Corporation. The 1,345,449 outstanding shares of Camelot were distributed to Itek shareholders in December 1981 in a "spin-off" transaction.

Vista is a Delaware corporation with its principal offices at 350 Fifth Avenue, New York, New York. Vista is engaged in, among other things, the business of manufacturing and selling leather and related products. In 1981 Vista had net earnings of $1,898,976 and cash on hand (and cash equivalents) of approximately $14 million. Vista's liquid assets consist principally of the proceeds of the September 1980 sale of the assets of Vista's predecessor in interest, the Seagrave Corporation. A suit for rescission of this transaction is presently pending in the Supreme Court, New York County and other litigation against Vista has been set forth in the record.

Goldstein is a vice-president of Drexel Burnham Lambert Inc. ("Drexel Burnham") and has acted as broker to Saltzman and Vista. Macera is chairman of the board and chief executive officer of Camelot and also a member of the board of directors of Itek Corporation. Counterclaim defendant Robert P. Henderson ("Henderson") is an uncompensated member of the board of directors of Camelot and is also chairman of the board and chief

executive officer of Itek Corporation. Counterclaim-defendant Robert B. Johnson ("Johnson") is president and chief operating officer of Camelot and is a member of Camelot's board of directors.

### The Tender Offer

The offer to purchase for cash 650,000 shares of Camelot stock at $7 a share ("Tender Offer") was made by Vista on March 15, 1982. The Tender Offer was conditioned upon the tender of 650,000 shares and the rejection by the shareholders of the amendments proposed to the Camelot certificate of incorporation and the incentive stock option plan, both to be voted upon at the April 7 meeting of the shareholders.

The Tender Offer revealed that Vista owns 72,733 shares of Camelot stock, approximately 5.41% of the amount outstanding and that the price of the stock, traded over the counter since December 24, 1981, ranged from bids of 3½ to 5 up to just before the making of the Tender Offer. The proration date of the Tender Offer is April 1, 1982, the date for the withdrawal of shares is April 2, and the Tender Offer expires at midnight on April 9, 1982 unless extended.

### The Proxy Solicitation

On March 4 and 5, 1982 Camelot mailed a proxy statement and notice of special meeting of stockholders dated March 3, 1982, calling for a stockholders meeting for April 7, 1982. Proxies were requested to vote in favor of amendments to Camelot's certificate of incorporation to include provisions

"(i) that the written request of more than 50% of the stockholders of the Company entitled to vote generally in the election of directors is required for stockholders to call a special meeting of stockholders,
(ii) that the stockholders may remove any director or the entire Board of Directors only for cause and only upon the affirmative vote of the stockholders of more than 50% of the outstanding shares of capital stock of the Company at a meeting of stockholders called for that purpose, and
(iii) that the affirmative vote of the holders of more than two-thirds (or, under certain circumstances, 90%) of the outstanding shares of capital stock of the Company entitled to vote generally in the election of directors is required to approve certain business combinations involving the Company if such business combinations have not been unanimously approved by the Company's Board of Directors."

The proxies also included approval of a proposed incentive stock option plan.

Pursuant to the direction of the SEC the amendments were labelled as "antitakeover" provisions. The proxy statement also stated that "management has no knowledge of any planned or threatened take-over offer."

On March 22, 1982 Vista issued a proxy solicitation urging the defeat of the management proposals.

### Events Leading to the Tender Offer

Camelot was organized in August 1981 as a wholly-owned subsidiary of Itek, which included many of the assets and liabilities of Itek's former domestic Vision Care Division. All of Camelot's present officers with the exception of Newton, were officers of Itek's vision care division before the formation of Camelot. Macera was the chief executive officer, and Johnson was the chief operating officer of Itek's vision care division. The duties being performed by Macera, Johnson and the other Camelot officers on behalf of Camelot are similar to the duties that each of them performed on behalf of Itek's vision care division. Pursuant to a prospectus dated December 15, 1981, all of the issued and outstanding capital stock of Camelot was distributed by Itek to the holders of record of Itek's common stock as of the close of business on December 31, 1981. The pro forma adjusted book value of Camelot stock at the time of the "spin-off" was between $24.37 and $30.11 per share.

Since January 1, 1982, Camelot has been operating as an independent, publicly-held company, and its shares are traded in the over-the-counter market through the National Association of Securities Dealers Automated Quotation System ("NASDAQ").

The December 15, 1981 Camelot prospectus disclosed the intent of the Camelot board of directors, consisting of Henderson, Macera and Johnson, to hold a special meeting of the Camelot stockholders in the spring of 1982 to consider, *inter alia*, "the stockholder vote required to approve a merger or consolidation, a sale of substantially all of Camelot's assets or a plan of liquidation, the number of shares required to be owned in order to call a special meeting of Camelot's stockholders and ... an incentive stock option plan covering Camelot's executive officers and certain key employees."

On January 11, 1982, the Camelot board of directors adopted resolutions providing that holders of more than 50% of the stock of Camelot may call a special meeting of stockholders, (previously Camelot's original by-laws provided this right on a request by the holders of 25% of the stock), that directors may be removed only for cause and only upon the vote of more than 50% of the outstanding shares and that a vote of more than two-thirds (or, under certain circumstances, 90% of the outstanding shares) be required for stockholder approval of certain business decisions, such as mergers, consolidations, combinations, etc. Resolutions were also accepted providing for an incentive stock option plan for officers and key employees, a management incentive compensation plan; and approving employment agreements (i) for Macera and Johnson which provide, *inter alia*, for payment of their annual base salaries and bonus awards for three years in the event of termination of their employment without cause and (ii) for other employees of Camelot which provide, *inter alia*, that their employment be extended for two years in the event of changes in Camelot's control.

In January, 1982, Goldstein, having reviewed the Camelot prospectus, requested George Lasky, a Drexel Burnham trader, to become a market maker in Camelot stock. Around February 1, 1982, Goldstein talked to Saltzman for the first time about Camelot. Goldstein knew Saltzman as the chairman of the board of a company that had recently sold substantially all of its assets, and possessed substantial cash. He had brokered certain unrelated stock transactions for Saltzman since their first contact in 1980.

Goldstein suggested that Saltzman look into acquiring Camelot stock, as it was substantially undervalued. Saltzman placed an order for Camelot stock with Goldstein and informed Goldstein that he might be interested in purchasing more Camelot stock. On February 2, 10 and 11, Goldstein purchased 18,233 Camelot shares on behalf of Vista and during the same period purchased 13,000 Camelot shares for Santa Monica Partners (SMP). SMP is a limited partnership for making long term investments, and Goldstein is its general partner.

On February 11, 1982 Saltzman requested Goldstein to set up a meeting with Camelot management and told Goldstein that he expected to buy a lot of stock. The same day, Goldstein called Macera to request a meeting on behalf of Goldstein's undisclosed principals to discuss Camelot. Macera advised Goldstein that he would be on vacation the following week and suggested that Goldstein call him again on Monday, February 22, 1982. Both Goldstein and Macera, separately, went to Florida on vacation.

On February 25, Saltzman called Goldstein to again request Goldstein to arrange a meeting with Camelot's management and Goldstein called both Macera and John W. Newton, secretary of Camelot, ("Newton"), revealed the identity of his clients, Saltzman and Vista, and succeeded in arranging a meeting for March 4.

Goldstein, in the February and early March period had at least three conversations with Steve Cohen ("Cohen") during which Camelot was discussed. Cohen is a registered representative of Drexel Burnham's Atlanta office. Cohen knew Goldstein to be interested in special situations.

During the first conversation, in early February, Goldstein told Cohen that Camelot was substantially undervalued and looked like a good investment. During the second conversation, Goldstein and Cohen discussed the April 7 Camelot stockholders' meeting, and Goldstein informed Cohen of his intended upcoming visit to Camelot's offices. Cohen was aware that Drexel Burnham was acting as a market maker for Camelot shares and believed that Goldstein was actively purchasing such shares.

On March 4, Goldstein and Saltzman travelled to Camelot's Burlington, Massachusetts headquarters and met with Macera and Newton. At that meeting, Saltzman informed Macera, as indicated in Newton's memorandum of the meeting, that:

> "while he would prefer to reach an amicable agreement with respect to his investment intention [on behalf of Vista] he intended to take a major position in any event and could do so quickly through an immediate *tender offer* followed by whatever action was necessary to prevent the proposed shareholder meeting." (Emphasis supplied)

According to the Newton memorandum, contemporaneously prepared and confirmed by both Saltzman and Macera to be fundamentally accurate, Saltzman stated that Vista "was prepared to take a 50 to 55% interest without hesitation, but that he [on behalf of Vista] would acquire enough shares to keep anyone else out." The Newton memorandum summarizes Saltzman's position by stating that Saltzman desired to obtain "a substantial interest in the company [Camelot] with the cooperation of management" or "without the cooperation of management through some sort of tender offer." The amount of shares to be acquired ranged from 10% to over 50%. The meeting was cordial in tone and friendly.

Later that afternoon Camelot's transfer agent made a "token mailing" of its proxy statement dated March 3. The bulk of the mailing took place the afternoon of March 5. Thereafter Macera met with lawyers and investment bankers to consider the situation. On March 9 Macera called Saltzman to arrange for a further meeting to explore Vista's purposes. A meeting was set for March 16 and Saltzman stated in the conversation that it was his intent to acquire a majority position.

On the afternoon of the March 4 meeting, Saltzman instructed counsel to prepare a tender offer. A meeting was held in their offices for that purpose on March 5 with proxy solicitors attending.

On March 11 Saltzman contacted Max Heine and arranged a luncheon meeting for Friday, March 12. Heine is a principal in the brokerage firm of Herzog Heine Geduld Inc., which is the investment advisor for Mutual Shares Corporation and Mutual Qualified Income Fund (collectively "MSC"). Prior to March 12, MSC was the single largest shareholder of Camelot shares, owning 97,900 shares of March 9. Despite their long acquaintance, Heine and Saltzman had not shared luncheon or dinner over the past ten years and according to Heine, Saltzman was in a hurry to accomplish this particular meeting.

Saltzman testified that only a minute and a half of the luncheon was taken up with Camelot matters and that the rest of the time was spent discussing Saltzman's own liquid position, a discussion which resulted in Saltzman's placing orders for stock purchases with Heine. However long it took, both men agreed that the proposals to be submitted to the Camelot shareholders were unwise and it was understood between them that the Camelot stock which was held by these institutions would be voted against the proposals.

On the Monday following the Heine-Saltzman meeting, on March 15, the tender offer was published.

In the meantime Goldstein continued to make purchases for Vista. He consulted with counsel and told Cohen that the recommendation to purchase Camelot stock that he had earlier given Cohen was borne out and that Camelot was still a substantially undervalued investment. Cohen, largely on the basis of Goldstein's advice, bought additional Camelot stock for his clients on or after March 5.

Subsequent to March 4, George Lasky of Drexel Burnham advised Goldstein that a block of Camelot shares was available from an institutional seller. Goldstein advised Lasky that a client would be interested in purchasing the 50,000 shares if the seller would provide Goldstein's client with a proxy to vote on the Camelot shareholder proposals at the April 17 meeting. Lasky's assistant, Michael Lynch, ascertained that the institutional seller had previously voted its proxy and, when Goldstein was so advised, Goldstein did not place a purchase order.

### Events Following the Announcement

After the announcement of the tender offer, representatives of Georgeson & Co., Inc. ("Georgeson"), a nationwide tender offer and proxy solicitation firm, sought to disseminate information about the tender offer. Georgeson personnel have personally responded to shareholder inquiries regarding the conditional nature of the Vista tender offer by advising that shareholder approval of the management proposals at the Camelot shareholder meeting is unlikely. At least one arbitrageur has been counselled by Georgeson personnel to vote against the proposals.

Upon commencement of the instant lawsuit against the defendants, Saltzman agreed to indemnify Goldstein for his legal fees.

Vista has prepared and issued a proxy solicitation dated March 22, 1982 in opposition to management's solicitation. It contains the following language:

> In voting on the Proposals, you should consider that the Camelot Board of Directors consists of only three directors, all of whom receive compensation from Camelot, and none of whom may be considered independent or disinterested.
>
> \*    \*    \*    .\*    \*    \*
>
> We have been advised by Camelot's transfer agent that the Board's proxy statement was mailed to you in the evening on March 5, 1982, although it bears a date of March 3, 1982, and states that it "will be sent to stockholders commencing

on or about March 4, 1982." The proxy statement also states: "The Company is not presently aware of any contemplated actions involving a proposed takeover or change in control." You should know that we met with management in the early afternoon on March 4 and informed them that we were interested in the possibility of making a tender offer for sufficient shares to enable us to control Camelot, and requested management to consider the desirability of a tender offer.

### Conclusions with Respect to the Tender Offer .

■ Vista has not disclosed the understanding that Saltzman reached with Heine with regard to voting against Camelot's proposals in violation of § 13(d), 15 U.S.C. § 78m(d), and Regulation 13D, 17 C.F.R. § 240.13d. Section 13(d) provides for the beneficial owner of more than 5% of a class of stock to disclose information prescribed by the rules and regulations of the Commission. 15 U.S.C. § 78m(d)(1). The Commission has mandated the filing of Schedule 13D and has issued special instructions for complying with schedule 13D. 17 C.F.R. § 240.13d–1, § 240.13d–101. Item 6 provides for the disclosure of "any contracts, arrangements, understandings or relationships ... among the [filing party, executive officers and directors] and between such persons and any person with respect to any securities of the issuer, including but not limited to transfer or voting of .any of the securities ...." 17 C.F.R. § 240.13d–101, at 106.

A most significant aspect of the Tender Offer as discussed above is its condition that the management proposals be defeated at the annual meeting. There is a substantial likelihood that a reasonable shareholder in deciding whether or not to tender would consider significant the knowledge that Heine, the largest single shareholder, and Vista, owning together over 10% of the total shares outstanding, had agreed to vote against the proposals. *Transcon Lines v. A.G. Becker, Inc.,* 470 F.Supp. 356, 376 (1979); *see TSC Industries, Inc. v. North-*

*way, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The failure by Vista to disclose the Saltzman-Heine agreement in its Schedule 13D filing thus amounts to noncompliance with Section 13(d).

Similarly, Camelot asserts that Vista's failure to disclose the Saltzman-Heine agreement in the Vista offer to purchase and Schedule 14D–1 violates Section 14(d), 15 U.S.C. § 78n(d), and section 14(e), 15 U.S.C. § 78n(e), which makes it unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made ... not misleading in connection with any tender offer."

Vista has not complied with Item 7 of the special instructions for complying with Schedule 14D–1, 17 C.F.R. § 240.14d–100, which provides for the disclosure of "any contract, arrangement, understanding or relationship ... between the bidder ... and any person with respect to any securities of the subject company (including, but not limited to, any contract, arrangement, understanding or relationship concerning the transfer or the voting of any such securities ...)."

The purpose of Section 13(d) is "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Similarly, the purpose of § 14(e) "is to ensure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977) (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975); *see Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145, 1154 (S.D.N.Y.1977).

■ In alleging violations of § 13(d) and 14(e) Camelot is asserting the right of its shareholders to be apprised of information which is probative on the shareholders' decisions concerning the vote on the proposals on April 7 and the tender offer. As such Camelot has standing to seek an injunction against false and misleading filings. *See GAF Corp. v. Milstein*, 453 F.2d at 719–721.

Camelot alleges that the tender offer amounted to a proxy solicitation which violated § 14(a), 15 U.S.C. 78n(a) and Rule 14a–3, 17 C.F.R. § 240.14a–3 because it was conditioned on the stockholders' rejection of Camelot's proposals to amend the Certificate of Incorporation and the incentive stock option plan which were to be voted upon at the April 7, 1982 stockholder meeting. Camelot argues that even though the tender offer did not specifically solicit a proxy, it, being conditioned on the vote, was aimed at influencing the vote.

Indeed, stockholders who tender their shares will be influenced to vote against management proposals. As such, the tender offer is sufficiently analogous to other communications which, although not formal proxy solicitations, have been held to violate § 14(a). *Sargent v. Genesco, Inc.*, 492 F.2d 750, 766–68 (5th Cir. 1974); *SEC v. Okin*, 132 F.2d 784, 786 (2d Cir. 1943); *Canadian Javelin Ltd. v. Brooks*, 462 F.Supp. 190, 194 (S.D.N.Y.1978); *SEC v. Topping*, 85 F.Supp. 63, 64 (S.D.N.Y.1949). Moreover, "writings which are part of a continuous plan ending in solicitation and which prepare the way for its success" are subject to the proxy rules. *SEC v. Okin*, 132 F.2d at 786. The tender offer, which induces a rejection of the proposals, followed by the proxy solicitation of March 22 is certainly part of Vista's plan to gain control of Camelot.

However, Vista notes other prior tender offers which were conditioned upon shareholder action and the absence of any authority for the proposition that a conditional tender also constitutes a proxy solicitation. Further Vista maintains that the Williams Act disclosures are sufficient to bar a claim of improper proxy solicitation citing *Dyer v. Eastern Trust and Banking Company*, 336 F.Supp. 890 (N.D.Me.1971). Finally

Vista points out the mootness of Camelot's contention, since the Vista proxy solicitation was made on March 22.

Whether or not the tender offer improperly omitted an exposition of Vista's opposition to the management proposals or whether it constituted a proxy solicitation as it stands, are issues which need not be determined here now, although given the language of 17 C.F.R. § 240.14a–1, Vista seems to have the better of the argument. Even if the tender offer is considered a proxy solicitation, the necessary disclosure has• for the most part been accomplished.

■ However, Camelot enumerates the following alleged material misrepresentation and omissions in the tender offer and contends that they amount to violations of the securities laws.

Failure to disclose that Saltzman told Camelot that the current liquidation value of Camelot is approximately $15.00.

Failure to disclose that the current book value of net assets exceeds $25.00.

Failure to disclose Vista's contingent liabilities from pending civil actions.

Failure to disclose planned discontinuance of employee incentive programs.

Failure to disclose that Saltzman's compensation exceeded $750,000 in fiscal year 1980.

Failure to disclose agreements between Vista, Saltzman, Heine, Goldstein.

Failure to disclose Vista's history of selling assets.

Failure to disclose Vista's loss of money from continuing operations.

Inaccurate description of the March 4 Saltzman-Goldstein-Camelot meeting.

As noted above, failure to disclose the Saltzman-Heine understanding evades sections 13(d), 14(d), 14(e) as well as Schedule 14B, 17 C.F.R. § 240.14a–102, which requires the disclosure of "any contract, arrangements or understandings with any person with respect to any securities of the issuer." However, none of the other omissions referred to above are sufficiently material to require disclosure. *See generally Missouri Portland Cement Co. v. H.K. Por-*

*ter Co.*, 535 F.2d 388 (8th Cir. 1976); *Zell v. InterCapital Income Securities*, 459 F.Supp. 819 (N.D.Cal.1978); *A & K Railroad Materials, Inc. v. Green Bay & W.R.R. Co.*, 437 F.Supp. 636 (E.D.Wis.1977); *Emhart Corp. v. USM Corp.*, 403 F.Supp. 660 (D.Mass. 1975).

■ Camelot's contentions that Vista violated Rule 10b–5 are dismissed for lack of standing. "[T]his Court has steadfastly refused to extend the reach of 10b–5 to give standing to an issuer." *GAF Corp. v. Milstein*, 453 F.2d at 721; *see Raybestos-Manhattan, Inc. v. Hi-Shear Industries, Inc.*, 503 F.Supp. 1122, 1133–34 (E.D.N.Y.1980).

■ Additionally, Camelot's allegation that concerted activity among Vista, Heine, Goldstein and Cohen, constituted a group under § 13(d)(3) and thus violated 13–D reporting requirements, have not been sufficiently established to warrant interim relief. There is no statement, no document, and no testimony to establish a common purpose in connection with the tender offer whatever the silent conviction of the individuals may have been. *See GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Similarly Camelot has failed to establish evidence of a Saltzman-Goldstein plan to make a tender offer for Camelot shares in violation of § 14(e).

■ Camelot has also alleged that Goldstein violated Rule 14e–3, 17 C.F.R. § 204.-14e–3, because he advised Cohen after the March 4 meeting that Goldstein's earlier recommendation to buy Camelot stock was borne out. Since Cohen purchased additional shares of Camelot stock largely on the basis of Goldstein's advice, Camelot asserts that Goldstein's comments to Cohen constitutes insider trading in violation of Rule 14e–3.

Rule 14e–3 states that "[i]f any person has taken a substantial step or steps to commence, or has commenced, a tender offer ...., it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) of the Act for any other person who is in posses-

sion of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which . . . has been acquired directly or indirectly from: (1) The offering person." Whatever his persuasion may have been, there is no evidence that Cohen received direct knowledge of the tender offer sufficient to violate the quoted section.

■ Saltzman's meeting with Camelot on March 4, 1982 in Goldstein's presence, was a substantial step taken by Vista in commencing its tender offer. *See O'Conner & Assoc. v. Dean, Whitter, Reynolds, Inc.,* [Current] Fed.Sec.L.Rept. ¶ 98,443 (S.D.N.Y. Jan. 19, 1982); *cf: Applied Digital Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145, 1152–55 (S.D.N.Y.1977) ("no actual offer need be in existence for a cause of action under section 14(e) to arise"). After the March 4 meeting Goldstein knew that Vista was going to buy Camelot stock in such quantities as to insure that no one else would get control. Although no conclusion was reached as to how this was to be accomplished, a tender offer was mentioned. Goldstein possessed inside information concerning Vista's decision relative to control of Camelot. However, the evidence does not establish that Goldstein knew of Vista's tender offer plan from any statement or document, despite his own internal certitude on the subject. Thus the action against Goldstein is dismissed.

*Conclusions with Respect to the Camelot Proxy Solicitation*

■ In its counterclaim, Vista alleges that Camelot's proxy solicitation of March 5, 1982 violated § 14(a), 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9, in that it failed to disclose Vista's intention to make a tender offer for Camelot shares, which became known to Camelot on March 4, 1982. The statement that "management has no knowledge of any planned or threatened take-over offer" was accurate, since Saltzman had not stated his plans, nor the method by which he intended to proceed or

whether he would seek control. Rather he had stated his purpose to the acquisition of sufficient shares to thwart any one else's attempt to control Camelot. To omit the fact of the meeting and a statement of Vista's announced purpose, which forespoke of the possibility of a control contest, in the context of the anti take-over provisions being proposed, was an omission of a material fact. Camelot's omission violated the "philosophy of full disclosure" which permeates the securities laws. *Kennecott Copper Corp. v. Curtiss-Wright,* 584 F.2d 1195, 1199 (2d Cir. 1978) (quoting *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977).

However, quite obviously, the omission has now been more than adequately covered by Vista's proxy solicitation of March 22. Nonetheless further time is required to permit the stockholders to have access to the full information.

Finally, Vista has failed to establish evidence to support its claim that Camelot violated § 14(a) by misleading statements in its proxy statement with regard to increasing the required shareholder vote to call a special meeting from 25% to 50%, the requirement having already been modified by the Camelot board in January.

*Conclusions with Respect to the Vista Proxy Solicitation*

■ Camelot's allegations that Vista has violated § 14(a), 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9, by making false and misleading statements with respect to material facts and by omitting to state material facts are valid in three respects. In its proxy solicitation, Vista alleges that the three board of directors receive compensation from Camelot. Henderson, however, is not compensated by Camelot. Additionally, Camelot challenges Vista's claim that none of the directors may be considered independent or disinterested. Delaware law defines interested directors in relation to a specific transaction. Del.Code Ann. Tit. 8, § 144.[1]

---

1. Section 144 provides:
   "§ 144. Interested directors; quorum.
   (a) No contract or transaction between a corporation and 1 or more of its directors or

officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers are directors or offi-

The independence and disinterest of directors have meaning only in the context of concrete actions taken by the board. *See Zapata v. Maldonado,* 430 A.2d 779 (Del. 1981). Henderson, as chairman and chief executive officer of Itek, which has significant ongoing transactions with Camelot, may be an interested director concerning Camelot's actions with regard to Itek. However, being an interested director on such an occasion does not constitute being an interested director concerning the Camelot proposals under consideration. The reference is thus false and misleading.

Finally Vista's statement that the Camelot proxy statement was mailed on March 5, 1982 is inaccurate, if not misleading. Some proxies, however few, were mailed on March 4, 1982. The fact is one of some significance given the emphasis placed upon it by Vista and this opinion.

In order for Camelot shareholders to receive full and fair information, these three items are to be corrected before resolicitation begins. Finally, Vista has failed to establish evidence to support its claim that Camelot violated § 14(a) by misleading statements in its proxy statement with regard to increasing the required shareholder vote to call a special meeting from 25% to 50%, the requirement having already been modified by the Camelot board in January.

### *Relief to be Granted*

■ In *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.

1981) the Second Circuit affirmed the denial of a motion for a preliminary injunction that would have prevented the tender offer for all of the target's outstanding stock. In reiterating the standard for a preliminary injunction, the court emphasized that "the showing of irreparable harm, the absence of an adequate remedy at law," the showing "that the harm which [movant] would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted" must be established before determining "whether there are 'serious questions going to the merits.'" *Id.*

In the instant case, both parties have established irreparable harm in that some shareholders have decided on and others would consider the proxy solicitations and the tender offer material even though they contained misleading information. *See Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468, 486 (E.D.Pa.1978). The harm suffered by Camelot and Vista by ordering a postponement of the meeting and a reissuance of the proxy materials and tender offer is mere delay which is greatly outweighed by the harm to the shareholders if such relief were not granted, namely, tender of their shares or a vote based on misleading information. Moreover, both Vista and Camelot have raised serious questions of law based on their allegations of violations of §§ 13(d), 14(a), 14(e).

cers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board of committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:
(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or
(3) The contract or transaction is fair to the corporation as to the time it is authorized, approved or ratified, by the board of directors, a committee, or the shareholders.
(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction."

Given the violations by both Vista and Camelot described above, the appropriate remedy is to adjourn the special meeting to April 17 and permit resolicitation of proxies by both parties. *See id.* Given the conditional nature of the tender offer, its effect on the vote of Camelot's proposals, its relationship to proxy solicitation and its own deficient disclosure, the March 15 tender offer is enjoined with permission to reoffer after compliance with proxy rules and disclosure rules.

Because of the ten day delay in conveying the information concerning Vista's purposes from March 5 to March 15, and because certain of the proxy material of both Vista and Camelot has been held to be inaccurate, a delay of ten days in the holding of the annual meeting seems appropriate to permit further solicitation. Because of the nature of the described omissions and misrepresentations of both the proxy solicitation and the tender offer, it can be assumed that corrections will be made by both Vista and Camelot. The inaccuracies do not rise to such a level as to vitiate the tender offer or preclude a meeting. *See Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1202 (2d Cir. 1978).

In order to frame an appropriate order to be entered on this opinion, the parties are directed to appear at Room 302 at 12:30 p. m. on March 30, 1982, having previously exchanged their proposed orders.

IT IS SO ORDERED.